John GATES; Robert Kinser; Clifford Travis; Dennis Conrad; Richard Doble; Edmund Vincelet; Richard Weyant and Jerome Binder; Jerome Binder, individually and on behalf of all others similarly situated, Plaintiffs–Appellees,

v.

VICTOR FINE FOODS; Golden Gate Fresh Foods, Inc., Defendant,

and

Fletcher's Fine Foods; Alberta Pork Producers Development Corporation, Defendants–Appellants.

No. 93–16141.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 15, 1995.

Decided May 16, 1995.

Richard W. Nichols, McDonough, Holland & Allen, Sacramento, CA, for defendants-appellants.

James E. Eggleston, Eggleston, Siegel & LeWitter, Oakland, CA, for plaintiffs-appellees.

Before: TANG and O'SCANNLAIN, Circuit Judges; MERHIGE,* District Judge.

O'SCANNLAIN, Circuit Judge:

This case requires us to explore the statutory maze of the Foreign Sovereign Immunities Act as it applies to Canadian entities that market and promote hogs raised in the Province of Alberta and operate a pork processing plant in British Columbia, either one of which might affect employees in a plant in California.

---

* The Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

## I

Alberta Pork Producers Development Corporation ("Alberta Pork") is a Canadian entity established pursuant to the Alberta Marketing of Agricultural Products Act, R.S.A. 1980, c. M–5, to provide for the effective marketing and promotion of hogs produced in the Province of Alberta. Alberta Pork is the sole marketing agent through which hogs raised in Alberta for slaughter must be sold. Hog producers must sell their hogs to Alberta Pork, which receives a service charge for each hog. Alberta Pork, in turn, sells the hogs to pork processors both within and outside of Canada and remits the proceeds to the producers.

In order to promote and to sell hogs effectively, Alberta Pork is authorized to acquire businesses that process and sell pork. Pursuant to this authority, Alberta Pork purchased Fletcher's Fine Foods ("FFF"), a pork processing plant headquartered in British Columbia, and it currently owns 100% of the shares of FFF. FFF, in turn, is parent to a number of subsidiaries, and through these subsidiaries owned Golden Gate Fresh Foods ("GGFF"), a California pork processing plant.

GGFF was located in Lodi, California and operated under the trade name of Victor Fine Foods. GGFF maintained a welfare benefit plan known as the Victor Fine Foods Group Benefits Plan ("the Plan"). Throughout the time that FFF owned GGFF, GGFF experienced great financial difficulties. Finally, on November 19, 1991, FFF discontinued its financial support of GGFF. The next day, GGFF terminated the Plan. On December 13, the GGFF plant closed, and all the employees were terminated.

The former employees of GGFF ("GGFF employees") brought a class action against GGFF, Alberta Pork, FFF and other defendants, asserting five claims: (1) violation of the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2101 et seq., for failure to provide 60–days notice of intent to close the plant; (2) violation of the continuation rules of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. §§ 1161–68, for failure to give the Plan participants notice of entitlement to, and actual opportunity to convert to, continuation health care coverage upon their terminations from employment; (3) breach of Plan obligations for failure to pay benefits for covered health care services rendered before the Plan was terminated; (4) breach of fiduciary duty for failure to cause the Plan to pay covered pre-Plan-termination benefits and to give notice of, and make available, continuation health care coverage; and (5) violation of section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140, for interfering with the GGFF employees' opportunities to obtain pre-Plan-termination and continuation health care coverage benefits by terminating the Plan.

Alberta Pork and FFF moved to dismiss for lack of subject matter jurisdiction pursuant to the Foreign Sovereign Immunities Act ("the Act"), 28 U.S.C. §§ 1602–1611. The district court declined to decide whether Alberta Pork and FFF were entities protected by the Act; instead, the court assumed that they were but concluded that the defendants were not immune from the court's jurisdiction in any event because the defendants' actions fell into the commercial activities exception to the Act's grant of immunity. Alberta Pork and FFF appeal.

## II

The Foreign Sovereign Immunities Act provides the exclusive source of subject matter jurisdiction over suits involving foreign states and their instrumentalities. *Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018, 1021 (9th Cir.1987), *cert. denied*, 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988). Under the Act, foreign states are presumed to be immune from the jurisdiction of United States courts unless one of the Act's exceptions to immunity applies. 28 U.S.C. § 1604. For instance, a foreign state is not immune if the plaintiff's cause of action is based upon a commercial activity carried on by the foreign state. 28 U.S.C. § 1605(a).

The parties first dispute whether the Act is even implicated. The GGFF employees contend that Alberta Pork and FFF are not "foreign states" within the meaning of the

Act, and thus can gain no protection from it. Assuming that the defendants are foreign states, the parties next dispute whether the defendants are nonetheless subject to jurisdiction because they fall into the Act's commercial activities exception. We examine these contentions in turn.

### III

The Foreign Sovereign Immunities Act provides immunity only for "foreign states." 28 U.S.C. § 1604. The Act defines a foreign state to include any "agency or instrumentality of a foreign state." 28 U.S.C. § 1603. In order for an entity to be considered an "agency or instrumentality," three requirements must be met. First, the entity must be a separate legal person. Second, the entity must not be a citizen of the United States nor be created under the laws of any third country. Finally, the entity must be either "an organ" of the foreign state or political subdivision thereof, or a majority of its shares must be owned by the foreign state or political subdivision thereof. 28 U.S.C. § 1603(b). The parties agree that the defendants satisfy the first and second requirements. Therefore, the issue before us is whether or not they are "organs" of a foreign state or political subdivision thereof, or majority-owned by a foreign state or political subdivision.

The Act's legislative history suggests that Congress intended the terms "organ" and "agency or instrumentality" to be read broadly. The House Report states that:

> entities which meet the definition of an "agency or instrumentality of a foreign state" could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, a steel company, a central bank, an export association, a governmental procurement agency or a department or ministry which acts and is suable in its own name.

H.R.Rep. No. 94–1487, 94th Cong. 2nd Sess. (1976), *reprinted at* 1976 U.S.C.C.A.N. 6604, 6614.

▬ The case law provides us with little guidance because most of the cases discussing this issue involve entities owned by socialist governments.[1] *See, e.g., Yessenin-Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 852 (S.D.N.Y.1978). Thus, in determining whether Alberta Pork and FFF are "foreign states" for purposes of the Act, we focus on the statutory text and legislative history. We examine each defendant in turn.

### A

Under Alberta law, the Marketing of Agricultural Products Act, R.S.A.1980, c. M–5, provides that producers of a particular agricultural product can apply to a governmental body called the Alberta Agricultural Products Marketing Council ("Council") for approval to establish a marketing board. *Id.* § 15. Pursuant to this procedure, hog producers submitted a plan which the Council approved, and Alberta Pork was formed as the marketing board for hog producers in 1968. Alberta Hog Producers' Marketing Plan, 1968, Alta.Reg. 195/68.

Although the Council does not appear to exercise day-to-day control over marketing boards, it does play an active supervisory role. For example, a board cannot be creat-

---

1. The cases that the GGFF employees cite are not relevant. The GGFF employees maintain that the defendants are not organs of a foreign state because "instrumentalities and agencies are accorded a presumption of independence from foreign states." However, there is no presumption of independence when considering the threshold question of whether an entity is a foreign state for purposes of the Act; rather, such a presumption comes into play only when courts must determine whether to impute the misdeeds of a government agency to the government itself. As the Fifth Circuit explained:

   The use of the single term "agency" for two purposes in the context of this case may cause

   some confusion. The [Act] uses it to determine whether an "agency" of the state may potentially qualify for foreign sovereign immunity itself under the [Act]. This is a completely different question from that which we must address here: whether or not the [National Grains Production Co.] enjoyed an alter ego relationship with the Federal Republic of Nigeria so that it could bind Nigeria to a contract.... [T]he level of state control required to establish an "alter ego" relationship is more extensive than that required to establish [Act] agency.

   *Hester Int'l Corp. v. Federal Republic of Nigeria,* 879 F.2d 170, 177 n. 5 (5th Cir.1989).

ed until a group of producers submits to the Council a proposed plan to be administered by a board. c. M–5, § 15. Once the plan is approved and the board is established, the Council may authorize the board to issue regulations requiring producers, among other things, to produce according to quotas, *id.* § 27(1)(a), to furnish information relating to the production and marketing of specified products, *id.* § 26(b), and to pay service charges, *id.* § 26(f). These provisions suggest that a board can act only in a manner and on the subjects that the Council has previously authorized. Indeed, when Alberta Pork wanted to buy FFF, the Council had to issue a regulation authorizing the acquisition. *See* Alberta Pork Producers' Marketing Plan, 1968 Amendment Regulation, Alta.Reg. 99/81.

The Council also has the authority to require a board to furnish it with any information and records that the Council desires. c. M–5, § 11. A board cannot issue any regulations without the approval of the Council, *id.* § 29(1), and if there is a conflict between regulations issued by the Council and regulations issued by a board, the Council's regulations prevail, *id.* § 28. Further, the Council may ask a board to amend or to repeal its regulations, and if the board does not do so within 45 days, the Council may do so itself. *Id.* § 30.

The Marketing of Agricultural Products Act also establishes a mechanism whereby a producer who is dissatisfied with a board decision can appeal to an appellate body appointed by the Minister. *Id.* §§ 36–43. In this way the board resembles an administrative agency. Finally, members of a board are immune from liability for acts performed in good faith in carrying out their duties, *id.* § 47—a protection normally afforded to governmental actors.

These provisions notwithstanding, the GGFF employees argue that the government is not significantly involved in the activities of Alberta Pork. The GGFF employees maintain that Alberta Pork is essentially a commercial operation—Alberta Pork buys live hogs from producers and sells them to pack-

ers. Further, Alberta Pork is supported by hog producers, not by the government. Alberta Pork is supported by a $1.25 per hog service charge that it receives from hog producers. Finally, the GGFF employees note that hog producers are the only persons eligible to become directors of Alberta Pork. Alta.Reg. 195/68, § 10. Consequently, the GGFF employees conclude that Alberta Pork is an agent of hog producers, not of the Province.

■ We reject the GGFF employees' arguments. Congress' statement in the legislative history that a "state trading company" and "an export association" can be "organs" of a foreign state indicates Congress' belief that an entity's involvement in commercial affairs does not automatically render the entity non-governmental. This conclusion is especially sound here given that the purpose of the entity in question is to advance the Province of Alberta's interest in marketing Alberta hogs. *Id.* § 3(1).[2] Finally, that the Province is not directly involved in the day-to-day activities of Alberta Pork does not mean that it is not exercising control over the entity, especially, as here, where the Province's laws and regulations narrowly circumscribe the entity's ability to act independently. Consequently, we conclude that Alberta Pork is an agency or instrumentality of the Province of Alberta.

### B

The clear language of the Act does not allow us to reach the same conclusion with respect to FFF, however. To recap, the Act provides that a "foreign state" includes an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). To be an "agency or instrumentality," the entity must *either* be an "organ of a foreign state" or have a majority of its shares owned by "a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b). FFF, an ordinary pork processing plant, cannot be considered an "organ" of the Province of Alberta. Thus, FFF can be an agency or instrumentality

---

**2.** In addition, Alberta Pork does more than just buy and sell hogs; it also carries on educational activities and supports research in the swine industry. Alta.Reg. 195/68, § 3(3)(c).

only if a majority of its shares is owned by "a foreign state or political subdivision thereof."

■ FFF is wholly owned by Alberta Pork. Alberta Pork, we have just concluded, is an agency or instrumentality of a foreign state. Thus, FFF is wholly owned by an agency or instrumentality of a foreign state; however, FFF is not owned by "a foreign state or political subdivision thereof," as required by the statute.

One might argue that once we determine that Alberta Pork is an agency or instrumentality, then it ipso facto becomes a foreign state or political subdivision thereof. However, the literal language of the statute requires us to reject that argument. First, the statute provides that a foreign state *includes* an agency or instrumentality, not that it *is* an agency or instrumentality or that it *is defined as* an agency or instrumentality. Second, the remainder of the statute contradicts any interpretation that would equate "an agency or instrumentality" with "a foreign state." If Congress had intended "agencies or instrumentalities of a foreign state" to mean "a foreign state" for the purposes of section 1603, then it also would have intended a "political subdivision" to mean "a foreign state" because section 1603(a) defines a foreign state as including both "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." The statutory language strongly indicates that Congress did not intend this interpretation, however, because the remainder of the section differentiates between "foreign states" and "political subdivisions thereof."

For example, section 1603(b)(2) provides that the entity must be "an organ of a foreign state *or political subdivision thereof,*" or a majority of its shares must be owned by a "foreign state *or political subdivision thereof.*" (Emphasis added).

Moreover, the legislative history repeatedly draws the same distinction. In the House Report Congress stated:

> The second criterion requires that the entity be either an organ of a foreign state *(or of a foreign state's political subdivision),* or that a majority of the entity's shares or

other ownership interest be owned by a foreign state *(or by a foreign state's political subdivision).* If such entities are entirely owned by a foreign state, they would of course be included within the definition. Where ownership is divided between a foreign state and private interests, the entity will be deemed to be an agency or instrumentality of a foreign state only if a majority of the ownership interests (shares of stock or otherwise) is owned by a foreign state *or by a foreign state's political subdivision.*

1976 U.S.C.C.A.N. 6604, 6614 (emphasis added).

Indeed, our reluctance to put words in Congress' mouth is especially justified here because Congress seemed exceedingly conscious of the distinction between foreign states, political subdivisions, and agencies or instrumentalities of foreign states and political subdivisions. It could easily have stated that an entity must be owned by a foreign state, a political subdivision *or an agency or instrumentality* of a foreign state or political subdivision. It did not. Moreover, a contrary reading of the statute could expand immunity far beyond what Congress intended. As it is written, the Act provides potential immunity to entities that are either organs of a foreign state or political subdivision thereof or have a majority of shares owned by the foreign state or political subdivision. To add to that list entities that are owned by an agency or instrumentality would expand the potential immunity considerably because it would provide potential immunity for every subsidiary in a corporate chain, no matter how far down the line, so long as the first corporation is an organ of the foreign state or political subdivision or has a majority of its shares owned by the foreign state or political subdivision.[3] Although such a broad view of sovereign immunity may very well be desirable, we cannot assume that Congress intended such a result when a literal reading of the statute leads to the opposite conclusion.

In sum, we hold that Alberta Pork is an agency or instrumentality under the Act and

---

**3.** This is because each subsidiary would be owned by an agency or instrumentality.

thus is immune from jurisdiction unless one of the Act exceptions applies. However, FFF cannot be considered an agency or instrumentality and thus is entitled to no protection from the Act.[4]

## IV

■ As an agency or instrumentality of a foreign state, Alberta Pork is entitled to immunity unless it falls into one of the Foreign Sovereign Immunities Act's exceptions to immunity. Once a plaintiff offers evidence that an Act exception applies, the party claiming immunity bears the burden of proving by a preponderance of the evidence that the exception does not apply. *Joseph v. Office of Consulate General of Nigeria,* 830 F.2d 1018, 1021 (9th Cir.1987), *cert denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988).

■ The Act was intended to codify the so-called "restrictive" principle of sovereign immunity. 1976 U.S.C.C.A.N. at 6605. "Under this principle, the immunity of a foreign state is 'restricted' to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis)." *Id.* Accordingly, the Act provides that foreign states which are engaging in commercial activity are not immune from the jurisdiction of the United States courts. Specifically, a court has jurisdiction in any case in which the action is based

> upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

■ In determining the commercial character of an activity, the Act directs courts to examine the nature of the act or course of conduct, rather than the purpose. 28 U.S.C. § 1603(d). Further, it is not enough for the defendant merely to have engaged in a commercial activity. Rather, the statutory language requires that the plaintiff's cause of action be "based upon" the commercial activity in question. *Saudi Arabia v. Nelson,* —— U.S. ——, ——, 113 S.Ct. 1471, 1477, 123 L.Ed.2d 47 (1993). Thus, a court must "focus only on those *specific* acts that form the basis of the suit" to determine whether those acts constitute or are in connection with the commercial activity. *Joseph,* 830 F.2d at 1023 (emphasis in original).

Here, the district court determined that Alberta Pork fell into the commercial activities exception and was therefore not immune. The district court had previously held that COBRA's definition of "employer" applied to the GGFF employees' COBRA and ERISA claims, and that Alberta Pork was an "employer" of the GGFF employees for the purposes of COBRA.[5] Based on that conclusion, the district court held that the activity at issue here was Alberta Pork's employment of the GGFF employees. Because the employment of United States residents is well-established as constituting a commercial activity, 1976 U.S.C.C.A.N. at 6615; *see also State Bank of India v. NLRB,* 808 F.2d 526, 535

---

**4.** Consequently, we need not reach the GGFF employees' contention that FFF waived its immunity.

**5.** COBRA provides that an "employer" includes corporations within a "controlled group of corporations," defined as any group of

> (1) *Parent-subsidiary control group.* One or more chains of corporations connected through stock ownership with a common parent corporation if
> (A) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all

classes of stock of each of the corporations, except the common parent corporation, is owned ... by one or more of the other corporations; and
(B) the common parent corporation owns ... stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of at least one of the other corporations, excluding, in computing such voting power or value, stock owned directly by such other corporations.

26 U.S.C. § 1563(a)(1).

(7th Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987), and because the GGFF employees' claims stemmed from their employment, the district court concluded that the claims were "based upon" the relevant commercial activity. Accordingly, the court denied the defendants' motion to dismiss for lack of subject matter jurisdiction.

■ We disagree with the district court's analysis. By referring to COBRA's definition of employer to determine whether the court had jurisdiction under the Act, the district court placed the substantive cart before the jurisdictional horse. A court can apply the substantive portions of a statute only after it has *independently* determined that it has jurisdiction. For example, in *NYSA–ILA Pension Trust Fund v. Garuda Indonesia,* 7 F.3d 35 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1065, 127 L.Ed.2d 384 (1994), the Second Circuit held that "[b]efore a federal court may apply corporate law, or the controlled group provisions of ERISA or any other rule of law in a case involving a foreign state or instrumentality of that state, it must, as a threshold matter, find an exception to the [Act]'s grant of sovereign immunity." *Id.* at 39. We agree with the Second Circuit that it is improper to rely on substantive law as a basis for a finding of jurisdiction under the Act.

Moreover, even if it were appropriate as a general matter to look to substantive law for guidance in the Act inquiry, such an inquiry cannot be upheld in the instant case. The Supreme Court has held that the Act presumes that separate juridical entities are normally to be treated as independent from one another. *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,* 462 U.S. 611, 626–27, 103 S.Ct. 2591, 2599–2600, 77 L.Ed.2d 46 (1983) (*"Bancec"*). In *Bancec* the Supreme Court stated:

> [d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations leads us to conclude ... that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such.

*Id.* (citation omitted). *See also Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1104 (9th Cir.1990). The *Bancec* Court went on to articulate two exceptions to the presumption of independence, however: (1) "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created"; or (2) where to give effect to the entities' separate form " 'would work fraud or injustice.' " 462 U.S. at 629, 103 S.Ct. at 2601 (quoting *Taylor v. Standard Gas Co.,* 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669 (1939)).

The Act's presumption of independence is in tension with COBRA's definition of "employer." That is, *Bancec* holds that entities are presumed to be independent unless a showing of domination and control is made. By contrast, COBRA determines a parent corporation's liability, not by examining how much actual control the parent exercised over the subsidiary, but solely by reference to the parent's stock ownership of the subsidiary.

The GGFF employees do not dispute that the presumption of independence is in tension with COBRA's definition of "employer"; however, they maintain that the presumption of independence simply is not applicable in a case involving a "violation of a remedial statute which specifically rejects the notion that a parent corporation can avoid the liability of its subsidiary for failure to offer employees health insurance continuation rights." That is, according to the GGFF employees, CO-BRA's derivative liability provisions trump the Act's normal presumption of independence.

Although the GGFF employees' argument has some logical appeal, we must reject it. The Act's presumption of independence is rooted in principles of international law: comity, sovereignty, and the equality of sovereigns. *See, e.g., Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 718 (9th Cir.1992) (noting that "the doctrine of foreign sovereign immunity is rooted in two bases of international law, the notion of sovereignty and the notion of the equality of sovereigns") (internal quotations omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993). In *Chuidian,* this court

stated that the Act's presumption of juridical separateness is based on "due respect for the actions taken by foreign sovereigns," "principles of comity," and the notion that "[i]f U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different U.S. corporations or between a U.S. corporation and its independent subsidiary." 912 F.2d at 1104 (citations omitted). We will not presume, without explicit congressional instruction, that Congress intended to contravene these fundamental principles in enacting COBRA.

Having determined that the district court's reliance on COBRA was inappropriate, we must now examine whether Alberta Pork engaged in commercial activities, without reference to COBRA's definition of "employer," that would place it into the Act's commercial activities exception. As noted above, we will not find jurisdiction merely because Alberta Pork engaged in a commercial activity. Rather, jurisdiction is proper only if the GGFF employees' legal claims are based upon the commercial activity in question. *See Saudi Arabia v. Nelson,* —— U.S. ——, ——, 113 S.Ct. 1471, 1477, 123 L.Ed.2d 47 (1993).

■ The GGFF employees allege five claims under COBRA, ERISA, and WARN. All of these claims arose out of GGFF's termination of the GGFF employees' health care coverage and termination of the GGFF employees' employment. Thus, in order to assert jurisdiction over Alberta Pork, we must conclude that Alberta Pork engaged in a commercial activity that forms the basis for the GGFF employees' employment-based claims. This we are unable to do.

Alberta Pork can be seen as engaging in two types of commercial activities. First, Alberta Pork sells hogs to pork processors in the United States. This commercial activity is not a sufficient basis for jurisdiction, however, because hog sales are unrelated to the GGFF employees' employment claims. Second, Alberta Pork owned, through subsidiaries, GGFF. Although such ownership could provide a basis for jurisdiction if it were determined that Alberta Pork was involved in the employment decisions in controversy, mere stock ownership, without more, does not create any relationship to the GGFF employees' claims, especially given the Act's presumption that separate juridical entities are to be treated as such.

The record contains no evidence to suggest that Alberta Pork was involved in GGFF's decision to cancel its Plan and to close its plant. There is no evidence that GGFF shared officers and directors with Alberta Pork. Nor is there any evidence that Alberta Pork participated in any decisions concerning GGFF's operations. Thus, we conclude that because Alberta Pork's commercial activities are unrelated to the GGFF employees' claims, Alberta Pork does not fall into the Act's commercial activities exception.

V

Finally, the GGFF employees contend that Alberta Pork has waived its immunity. The Act provides that a foreign state shall not be immune from the jurisdiction of United States courts if "the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1).

■ This court has held that the waiver exception must be narrowly construed. *Joseph,* 830 F.2d at 1022. Generally speaking, implicit waivers are found only where (1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that the law of a particular country should govern the contract; or (3) a foreign state has filed a responsive pleading without raising the defense of sovereign immunity. *Id.*

The GGFF employees maintain Alberta Pork waived immunity "by participating in loan and credit transactions ... which expressly provide for jurisdiction of the United States courts." The GGFF employees call particular attention to the "credit arrangements undertaken for the sole and exclusive purpose of funding GGFF Lodi plant operations."

The GGFF employees' argument is not persuasive, however. As Alberta Pork points out, the GGFF employees' theory seems to be that if a foreign state enters into one agreement as to which it waives immunity, then the foreign state has implicitly waived immunity for all of its other transactions, regardless of how unrelated the transactions are to one another. Such a theory does not comport with the narrow construction that the waiver exception must receive. Just because Alberta Pork may have agreed to submit to the jurisdiction of United States courts in connection with a loan collection action by a bank in Washington State,[6] it does not in any way mean that they also agreed to submit to the jurisdiction of United States courts in connection with a dispute involving GGFF employees in California. Thus, we conclude that Alberta Pork did not waive its immunity under the Act.

## VI

Foreign sovereign immunity is premised on comity and respect for the equality and independence of sovereigns. Although the United States has enacted the restrictive principle of sovereign immunity, whereby foreign states do not enjoy immunity over claims based on their commercial activities, a foreign state does not lose its immunity under the Foreign Sovereign Immunities Act merely by engaging in some commercial conduct no matter how unrelated to the cause of action in question. Because the GGFF employees' employment-based claims are not related to Alberta Pork's commercial activities, Alberta Pork is immune from jurisdiction.

By contrast, we conclude that the district court correctly exercised jurisdiction over FFF because FFF does not meet the statutory definition of a foreign state and thus is afforded no protection from the Foreign Sovereign Immunities Act.

AFFIRMED in part, REVERSED in part, and REMANDED. Each party to bear its own costs.

---

6. This fact is in controversy, in any event. Although FFF clearly entered into such loan agreements, Alberta Pork's role in GGFF's financing is less clear.