CORPORACION MEXICANA DE SERVICIOS MARITIMOS, S.A. DE C.V., A Mexican corporation, Plaintiff–Counter–Defendant–Appellee,

Pemex–Refinacion, Plaintiff–In–Intervention–Counter–Defendant–Appellee,

v.

The M/T RESPECT, her Engines, Boilers, etc., in rem and Respect Shipping Private Limited, a Singapore corporation and Trans Petrol Services N.V., a Belgian corporation, in personam, Defendants–Counter–Claimants–Appellants.

No. 95–56874.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 9, 1996.

Decided July 16, 1996.

As Amended on Denial of Rehearing Aug. 28, 1996.

David E.R. Woolley and Thomas G. Walsh, Williams Woolley Cogswell Nakazawa & Russell, Long Beach, California, for defendants-counter-claimants-appellants.

Albert E. Peacock, III, Keesal, Young & Logan, Anchorage, Alaska; Robert D. Feighner, Keesal, Young and Logan, Long Beach, California, for plaintiff-in-intervention-counter-defendant-appellee.

Ambassador Miguel Angel Gonzales Felix, Legal Advisor of the Secretariat of Foreign Relations of Mexico, United Mexican States, Mexico D.F., Mexico, for amicus.

Before: O'SCANNLAIN and TROTT, Circuit Judges, and VAN SICKLE, District Judge.*

* The Honorable Bruce M. Van Sickle, Senior United States District Judge for the District of North Dakota, sitting by designation.

TROTT, Circuit Judge:

In this case we decide whether Pemex–Refinacion (Pemex–Refining), a subsidiary of Petroleos Mexicanos (Pemex), is an "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b) and therefore eligible for the protection of the Foreign Sovereign Immunities Act (FSIA or Act), 28 U.S.C. §§ 1602–1611. It is. However, we hold that Pemex–Refining waived, in part, its immunity by intervening in this action and filing a complaint against the defendants, M T RESPECT, Respect Shipping, and Trans Petrol Services. Finally, we hold that the district court improperly ordered the defendants to transfer $1.2 million to Pemex–Refining.

## BACKGROUND

In July of 1994, Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. (CMSM), a Mexican corporation, entered into a freight contract with Pemex–Refining to transport fuel. Pemex–Refining was anticipating an increase in domestic demand for automotive fuels but did not have the necessary Mexican-flag vessels to carry these fuels from its Southern Mexico refineries to its Northern Mexico users.

In furtherance of its agreement with Pemex–Refining, CMSM contracted to purchase the M/T RESPECT, a two-year old petroleum tanker owned by Respect Shipping Private Limited, a Singaporean corporation, and managed by TransPetrol Services N.V., a Belgian corporation. Later, CMSM allegedly reneged on its purchase agreement with Respect Shipping. However, CMSM promised that it would eventually purchase the M/T RESPECT, and the two companies agreed that in the meantime CMSM would timecharter the tanker.

In August 1994, Pemex–Refining asked CMSM to transport a shipment of fuel, including diesel and gasoline, from Salina Cruz, Mexico, to Rosarito, Mexico. CMSM duly ordered the defendants to carry out the request, and the M T RESPECT was loaded with the different fuels. However, when the M/T RESPECT arrived in Rosarito, a Pemex–Refining official inspected the ship, discovered that some of the diesel fuel was contaminated with gasoline, and refused to allow the tanker to be unloaded. Respect–Shipping denied it contaminated the diesel and insisted that Pemex–Refining's facility at Salina Cruz was to blame.

The M/T RESPECT returned to Salina Cruz expecting to unload the contaminated fuel there. However, Pemex–Refining refused to allow the off-loading. This effectively forced the ship out of commission because the unloaded fuel made it impossible for the ship to transport the fuel designated for the next trip.

On September 28, 1994, Pemex–Refining, Respect Shipping, and CMSM executed a written agreement (the September agreement) providing for an investigation into the contamination. The agreement required the ship to remain in Mexico until the dispute was resolved. Three days later, the defendants weighed anchor and set a course for California where they intended to exercise their carrier's lien on the fuel for their unpaid charter-hire. The defendants assert that they did not believe that they could receive legal protection in Mexico because of widespread corruption.

According to the defendants, while the M/T RESPECT was on its way to California, Pemex–Refining instructed a Mexican Navy frigate to stop and board the M/T RESPECT and, if there was any reasonable pretext to do so, turn the vessel around and force it into Mexican waters. The vessel was boarded under threat of large caliber gunfire, but all of its papers were in order and it was allowed to proceed. The tanker arrived in Long Beach on October 14, 1994.

Pemex–Refining complained to the Mexican Attorney–General who invoked the Cooperation Compact with the United States. The United States Customs Service detained the M/T RESPECT in Long Beach Harbor, but later released the ship after the defendants explained what had happened in Mexican waters.

CMSM filed a complaint for conversion of the contaminated fuel and brought an *ex parte* motion for arrest of the M/T RESPECT, which was granted on October 18,

1994. CMSM's amended complaint added claims for conversion of the ship, breach of charter-party contract, intentional interference with economic relationships, and unseaworthiness. Defendants appeared and answered the complaint. They denied that they had damaged the cargo or that they converted the vessel.

CMSM refused to release the vessel from arrest. Following a motion brought by the defendants to set a release security, Magistrate Judge King set a full *in rem* security on all claims at $1.65 million (the predicted value of the contaminated fuel on the American market), permitted a bond for that amount to be substituted for the vessel, allowed the defendants to sell the contaminated fuel, and required the defendants' counsel to hold in trust the proceeds from the fuel sale. The fuel was actually sold for $1.2 million.

The defendants filed a counterclaim against CMSM on November 17, 1994 (and an amended counterclaim on February 9, 1995) seeking $28.35 million in damages, punitive damages, and rescission of the September agreement.

After the defendants filed their counterclaims, CMSM apparently lost interest in the litigation. On March 2, 1995, its lawyers were granted leave to withdraw because CMSM had stopped paying them. CMSM has not appeared in this litigation since then. Default was entered by the Clerk on the defendants' amended counterclaim against CMSM on March 9, 1995.

On May 11, 1995, Pemex–Refining intervened as a plaintiff in this action. At the time of intervention, Pemex–Refining expressly waived the doctrine of forum non conveniens, and sued the M T RESPECT *in rem* for the same cargo claimed by the defaulting CMSM. Pemex–Refining's complaint-in-intervention stated that jurisdiction was proper under the court's admiralty jurisdiction and alleged five causes of action against the defendants: conversion of cargo by fleeing from Mexico with the contaminated fuel; breach of the warranty of seaworthiness by allowing the fuel to become contaminated; negligence in contaminating the fuel;

punitive damages for fleeing Mexican waters; and breach of the September agreement.

The defendants then filed eleven counterclaims against Pemex–Refining including: negligent wrongful refusal to accept delivery of cargo; intentional wrongful refusal to accept cargo; breach of oral and written contract of indemnity; fraud in the inducement to carry cargo; wrongful refusal to discharge; tortious interference with contractual benefit; intentional interference with contractual rights; rescission; trespass to chattels (for the arrest of the RESPECT in Long Beach); and blacklisting.

Pemex–Refining and the defendants each made a number of motions. Among these were a motion by the defendants for default judgment against CMSM and a Pemex–Refining motion, based on FSIA principles, for possession of the proceeds of the sale of the fuel.

The district court simultaneously considered all of the outstanding motions and determined that the central issue was whether Pemex–Refining was entitled to foreign sovereign immunity under the FSIA. The court held that Pemex–Refining fell within the protection of the FSIA, ordered the defendants to transfer to Pemex–Refining the $1.2 million in funds from the sale of the contaminated fuel, and held that all of the remaining motions were moot because under the FSIA it would be improper for the court to proceed further. This appeal followed.

## DISCUSSION

### I. Pemex–Refining's Status Under the Foreign Sovereign Immunity Act.

#### A. *Background on Pemex–Refining*

Under Article 27 of the Constitution of the United Mexican States, the government of Mexico is the only entity that may own and exploit the country's natural resources, including all petroleum and hydrocarbons. CONST. POLITICA DE LOS ESTADOS UNIDOS MEXICANOS, Art. 27. The Constitution permits the federal government to create organizations that manage and distribute these resources.

From 1938 until 1992, all petroleum production, manufacturing, transportation, distribution, and commercialization in Mexico was performed by Petroleos Mexicanos (Pemex) which is "an agency or instrumentality" of the Mexican government. *See Tubular Inspectors Inc. v. Petroleos Mexicanos*, 977 F.2d 180 (5th Cir.1992). In 1992, Pemex was restructured by presidential decree with the approval of the Mexican Congress. The restructuring created four subsidiaries to Pemex, each of which is responsible for a separate part of the Mexican petroleum business.

Each of the Pemex subsidiaries is a legal entity empowered to own property and carry on business in its own name. Each is administered and directed by eight members who are appointed by the Federal Executive. Four of the members are representatives of the federal government, three are general directors from the other subsidiaries, and the eighth is the General Director of Pemex.

Pemex–Refining is responsible for the industrial process of refining, manufacturing and distributing petroleum-derived products, including gasoline, diesel and jet fuel. All of its acquisitions and shares must be approved by the government. Its employees are subject to the rights and obligations of public servants. In its dealings with government agencies, Pemex–Refining is not required to post the customary performance bond, in part because the government of Mexico guarantees Pemex–Refining's performance.

### B. *Analysis*

■ The FSIA is the exclusive source of subject matter jurisdiction over suits involving foreign states and their instrumentalities. *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1459 (9th Cir.1995), *cert. denied*, — U.S. ——, 116 S.Ct. 187, 133 L.Ed.2d 124 (1995). The Act provides that "a foreign state shall be immune from the jurisdiction of the Courts of the United States and of the States" except in certain specified circumstances. 28 U.S.C. § 1604. Under the FSIA, a "foreign state" includes any "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). In turn, an "agency or instrumentality of a foreign state" is defined as:

any entity—(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or a political subdivision thereof, *or* a majority of whose shares or other ownership interest is owned by a foreign state or a political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c)and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b) (emphasis added).

The defendants argue that Pemex–Refining does not qualify as an "agency or instrumentality of a foreign state" under § 1603(b)(2) because it is a subsidiary of Pemex. For authority, the defendants cite to *Gates v. Victor Fine Foods*, 54 F.3d at 1461–63. *Gates* focused on § 1603(b)(2) of the FSIA. In that case, a group of plaintiffs in California sued Alberta Pork and its fully owned subsidiary, Fletcher's Fine Foods (FFF). Alberta Pork was a pork marketing board in Alberta, Canada; its primary role was to purchase live hogs from producers and sell the porkers to packers. *Id.* at 1461. FFF was a pork processing plant headquartered in British Columbia, Canada. *Id.* at 1459. Both Alberta Pork and FFF claimed that they were "agencies or instrumentalities of a foreign state" and hence immune from the court's jurisdiction under the FSIA.

We explained in *Gates* that there are two ways in which an entity can fulfill the requirements of § 1603(b)(2). *Either* the entity can be an "organ of a foreign state," *or* the entity can have a majority of its shares or other ownership interest owned by "a foreign state or a political subdivision thereof." *Id.* at 1461. Applying the two-part test of § 1603(b)(2) to Alberta Pork and FFF, we held that Alberta Pork was an organ of a foreign state even though the government did not exercise day-to-day management over the entity. We noted that the government played an active supervisory role: Alberta Pork could only act on matters the government authorized; the government could order it to change its regulations; producers who were dissatisfied with a decision by Alberta Pork could appeal to an appellate body appointed by the government; and members

of Alberta Pork's board were given immunity from liability similar to that given to government actors. *Id.* at 1460–61.

Having found that Alberta Pork was an "agency or instrumentality of a foreign state," we then considered the status of FFF under § 1603(b)(2). We quickly rejected the idea that FFF could be "an organ of a foreign state" because it was only "an ordinary pork processing plant." *Id.* at 1461. Next, we considered FFF's contention that it was an agency or instrumentality of a foreign state by virtue of the fact that 100% of its shares were held by Alberta Pork. We rejected this contention and held that the ownership test of § 1603(b)(2) applied only to the first tier of ownership: an entity wholly owned by "an agency or instrumentality of a foreign state" is not owned by a "foreign state or a political subdivision thereof" and therefore does not meet the definition of § 1603(b)(2). *Id.* at 1462.

In the instant case, the defendants claim that Pemex–Refining does not meet the ownership test of § 1603(b)(2) because it is a subsidiary of Pemex and therefore should be analogized to FFF in *Gates.* However, the defendants' focus on only one prong of § 1603(b)(2) ignores the possibility that Pemex–Refining could be an "organ of a foreign state" and therefore fulfill § 1603(b)(2)'s requirements by a different route.

■ Pemex–Refining fulfills the "organ of a foreign state" prong of § 1603(b)(2). As the district court explained,

> [Pemex–Refining] is an integral part of the United Mexican States. Pemex[–Refining] was created by the Mexican Constitution, Federal Organic Law, and Presidential Proclamation; it is entirely owned by the Mexican Government; is controlled entirely by government appointees; employs only public servants; and is charged with the exclusive responsibility of refining and distributing Mexican government property. Thus Pemex–[Refining] is a subdivision of the United Mexican States and therefore qualifies for foreign sovereign immunity under FSIA.

The defendants have not contested this description of Pemex–Refining. In a compari-

son with our decision in *Gates,* Pemex–Refining is much more of an "organ" of the government of Mexico than Alberta Pork is of the province of Alberta. Therefore, the FSIA applies to this action.

## II. Pemex–Refining's waiver of its foreign sovereign immunity

### A. *Did Pemex–Refining implicitly waive all of its FSIA immunity?*

The defendants contend that Pemex–Refining implicitly waived any claim that it had for immunity when it intervened in this action. 28 U.S.C. § 1605 states that a foreign state is not immune from the jurisdiction of United States courts if "the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver." 28 U.S.C. § 1605(a)(1).

■ The waiver exception is narrowly construed. The legislative history of the Act indicates that implicit waivers are ordinarily found in three situations: "(1) a foreign state has agreed to arbitration in another country; (2) a foreign state has agreed that a contract is governed by the law of a particular country; and (3) a foreign state has filed a responsive pleading in a case without raising the defense of sovereign immunity." *Joseph v. Office of Consulate General of Nigeria,* 830 F.2d 1018, 1022 (9th Cir.1987) (emphasis added), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988). Since the creation of the FSIA, courts have resisted expanding the scope of the implied waiver beyond these three examples. *Rodriguez v. Transnave Inc.,* 8 F.3d 284, 287 (5th Cir. 1993); *Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 377 (7th Cir.1985). "The implicit waiver clause of section 1605(a)(1) has therefore been narrowly construed; courts rarely find that a nation has waived its sovereign immunity without *strong evidence* that this is what the foreign state *intended.*" *Rodriguez,* 8 F.3d at 287 (emphasis added); *Frolova,* 761 F.2d at 377.

■ Here, Pemex–Refining invoked the defense of sovereign immunity in its first

responsive pleading: its answer to Respect's counterclaim. It was not necessary for it to mention the FSIA in its motion to intervene because the defendants had not yet filed their counterclaims against Pemex–Refining. If the defendants had not filed counterclaims, there would be nothing from which Pemex–Refining had to claim sovereign immunity.

Moreover, aside from the fact that Pemex did not assert its immunity in its complaint, there is no evidence to show that the immunity was intentionally waived. For example, prior to the intervention, Pemex–Refining sent two letters to the defendants asserting its sovereign immunity. Therefore, we hold that Pemex–Refining did not make a general waiver of its immunity under the FSIA.

B. *Did Pemex–Refining waive part of its FSIA immunity?*

██ A review of the case shows that Pemex–Refining clearly waived part of its immunity by intervening and filing a claim against the defendants. Section 1607 of the FSIA states: "In any action brought by a foreign state, or in which a foreign state intervenes ... the foreign state shall not be accorded immunity with respect to any counterclaim ... arising out of the same transaction or occurrence that is the subject matter of the claim of the foreign state." 28 U.S.C. § 1607 & 1607(b).

Here, the district court did not analyze which of the counterclaims arose out of the same transaction or occurrence as Pemex–Refining's claims. Even Pemex–Refining cannot explain why all of the defendants' counterclaims should be precluded under a partial waiver analysis. Therefore, we reverse the district court's order dismissing the case for lack of jurisdiction and instruct the court to determine which counterclaims arose from the "same transaction or occurrence" as Pemex–Refining's claims.

III. **The District Court improperly Ordered the Defendants to Transfer $1.2 million to Pemex–Refining.**

Despite the fact that the district court held that it did not have jurisdiction to decide the dispute between the parties, the court ordered the defendants to turn over to Pemex–Refining the $1.2 million they received from the sale of the contaminated fuel and which was then being held under court order by the defendants' lawyer. The district court reasoned, "Under FSIA, a foreign sovereign's property cannot be attached. Therefore, the pre-judgment attachment of Pemex's property was improper."

██ We cannot follow the district court's reasoning. Under § 1609 of the FSIA, a foreign state's property "shall be immune from attachment, arrest, and execution" except in certain enumerated circumstances, none of which applies here. However, the defendants did not seek judicial attachment, arrest, or execution of the fuel. The defendants did not have the fuel because the magistrate judge had given it to them or because he had ordered it attached or arrested. They had the fuel because they had taken it from Mexico. Undoing the order placing the $1.2 million in trust would only put the property back into the hands of the defendants, not Pemex–Refining.

Pemex–Refining also characterizes the district court's dismissal of the action and transfer of the $1.2 million as a *sua sponte* application of the doctrine of forum non conveniens.[1] However, this doctrine is "nothing more or less than a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined." *American Dredging Co. v. Miller,* 510 U.S. 443, ——, 114 S.Ct. 981, 988, 127 L.Ed.2d 285 (1994). The doctrine is merely procedural. *Id.* While it may be proper for the district court to dismiss the action on the basis of forum non conveniens, nothing in the doctrine allowed the court to transfer property from one party to another. Therefore, we reverse the district court's order transferring the $1.2 million to Pemex–Refining.

---

1. Although Pemex–Refining waived the doctrine of forum non conveniens when it intervened in this action, the district court could still raise the issue *sua sponte. Heller Financial, Inc. v. Mid-whey Powder Co.,* 883 F.2d 1286, 1293 (7th Cir. 1989); *Plum Tree, Inc. v. Stockment,* 488 F.2d 754, 757 (3rd Cir.1973).

## CONCLUSION

The district court's order dismissing the action and transferring the $1.2 million to Pemex–Refining is reversed, and we remand this case for further proceedings. The district court correctly concluded that the FSIA is applicable to this case because Pemex–Refining is an "organ" of the Mexican government and therefore an "agency or instrumentality of a foreign state." However, because Pemex–Refining partially waived its immunity by filing a complaint, the district court erred in concluding that under the FSIA, it lacked jurisdiction over this action. In addition, the district court incorrectly ordered the $1.2 million transferred to Pemex–Refining. The only effect of undoing the district court's earlier order arresting the property is to return it to the defendants.[2] The parties shall bear their own costs on appeal.

---

**2.** The defendants, as part of their appeal, have asked this court to order the district court to enter a proposed default judgment against the now-absent CMSM. We decline to do so because the default judgment may adversely affect Pemex–Refining's interests, *see Kamilche Co. v.* *United States,* 53 F.3d 1059, 1061 n. 1 (9th Cir. 1995), *modified,* 75 F.3d 1391 (9th Cir.1996) (third party may assert the rights of another where third party has a distinct and personal interest in the litigation), and this issue can be more appropriately handled by the district court.