**Annie Kampenya MUSOPOLE,**
**Plaintiff,**

v.

**SOUTH AFRICAN AIRWAYS (PTY.) LIMITED, A/K/A South African Airways A/K/A South African Air, Defendants.**

**No. 01 CIV 3384 LAK.**

United States District Court,
S.D. New York.

Oct. 29, 2001.

(Compl. Ex. 1, at 32.)

**444**

Yetta G. Kurland, Gershberg & Gershberg, for Plaintiff.

Patrick J. Bonner, Freehill, Hogan & Mahar, New York City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Annie Kampenya Musopole filed this action in New York State Supreme Court alleging various contract and tort claims against South African Airways Ltd. ("SAA") as a result of an incident that occurred at John F. Kennedy International Airport in which an SAA employee allegedly harassed and intimidated plaintiff and prevented her from boarding her SAA flight to Malawi. Defendant removed the action to this Court under 28 U.S.C. § 1441(d), alleging foreign sovereign status under the Foreign Sovereign Immuni-

ties Act ("FSIA").[1] Currently before the Court is plaintiff's motion to remand the action to state court on the ground that SAA is not a "foreign state" within the meaning of the FSIA.

### Jurisdictional Facts [2]

SAA is a corporation organized under the laws of South Africa.[3] Eighty percent of its stock is owned by Transnet Ltd., also a South Africa corporation, the shares of which are controlled by South Africa's Minister for Public Enterprises.[4] Transnet, prior to its incorporation in 1990, was the South African government's Railways and Harbors Administration.[5] In addition to SAA, Transnet operates six other transport businesses within South Africa, including the railroads, a high-pressure pipeline and the major ports, as well as related and support businesses.[6]

### Discussion

Section 1441(d) of the Judicial Code allows a "foreign state," as defined by the FSIA,[7] sued in a state court to remove the action to federal court.[8] Section 1603(a) of the FSIA states that the term "foreign state" "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b)."[9] As SAA is not itself a sovereign nation, the question here is whether it is "an agency or instrumentality" of South Africa, a term defined in 28 U.S.C. § 1603(b) as an entity

---

1. 28 U.S.C. § 1601 et. seq.

2. The details of plaintiff's claim against SAA are immaterial to the present motion.

3. See Def. Mem. Ex. A (Ellinger Dec. ¶ 3).

4. Id.

5. Id. ¶ 2.
 The Court infers from the foregoing that the government of South Africa owns all of the shares of Transnet, a point not specifically

addressed in the papers before the Court. Plaintiff of course is free to challenge that assumption should further proceedings suggest that it may be inaccurate.

6. Id.

7. See 28 U.S.C. § 1603(a).

8. See id. § 1441(d).

9. Id. § 1603(a).

"(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country." [10]

The parties agree that SAA meets the first and third prongs of this clause—that is, that it is a separate legal person and that it is neither a citizen of a State of the United States nor created under the laws of any third country. The disagreement concerns the second prong. And even here the dispute is narrow. The parties agree, at least tacitly, that SAA is neither an organ nor a political subdivision of South Africa. The only point of difference is whether a majority of its shares is owned by a foreign state or political subdivision thereof—in the context of this case, whether Transnet is a foreign state or political subdivision thereof or, to put it more generally, whether a second-tier subsidiary of a foreign state—that is, a majority-owned subsidiary of a majority-owned subsidiary, the latter of which concededly is an "agency or instrumentality" of a foreign state—itself is an "agency or instrumentality" of a foreign state. The issue thus presented raises a troublesome prob-

lem of statutory construction that has divided the courts, including this one, that have considered it. [11]

The linguistic argument in favor of jurisdiction is that (1) the first-tier subsidiary is an "agency or instrumentality" of the foreign state by virtue of the foreign state's direct ownership of a majority of the first-tier subsidiary's shares, (2) because the first-tier subsidiary is an "agency or instrumentality" under Section 1603(b), it is a "foreign state" as defined in Section 1603(a), and (3) the first-tier subsidiary's ownership of a majority of the shares of the second-tier subsidiary makes the latter an "agency or instrumentality" of the first-tier subsidiary and therefore makes the latter a "foreign state."

Were this the unequivocal import of the statutory language, the Court would be obliged to hold that SAA is a "foreign state" within the meaning of the pertinent statutes and find jurisdiction here. But the statute is not clearly drafted and, as the Ninth Circuit has pointed out, this argument takes some liberties with the statutory language. [12]

To begin with, Section 1603(a) provides that "a foreign state includes an agency or instrumentality, not that it *is* an agency or instrumentality or that it *is defined* as an agency or instrumentality." [13] Thus, the equation of an "agency or instrumentality" with "foreign state" in step (2) of the argu-

**10.** *Id.* § 1603(b).

**11.** *Compare, e.g., Delgado v. Shell Oil,* 231 F.3d 165 (5th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1603, 149 L.Ed.2d 470 (2001); *In re Air Crash Disaster Near Roselawn, Indiana on October 31, 1994,* 96 F.3d 932 (7th Cir.1996); *Antoine v. Atlas Turner, Inc.,* 66 F.3d 105 (6th Cir.1995); *Gilson v. Republic of Ireland,* 682 F.2d 1022 (D.C.Cir.1982); *Lehman Bros. Comm. Corp. v. Minmetals Int'l Non–Ferrous Metals Trading,* 169 F.Supp.2d 186 (S.D.N.Y.2001), *with EOTT Energy Oper. L.P. v. Winterthur Swiss Ins. Co.,* 257 F.3d

992, 997 (9th Cir.2001); *Patrickson v. Dole Food Co.,* 251 F.3d 795, 806–07 (9th Cir.), *pets. for cert. filed* (Oct. 5 & 9, 2001) (Nos.01– 593, 01–594); *Gates v. Victor Fine Foods,* 54 F.3d 1457 (9th Cir.1995); *Hyatt Corp. v. Stanton,* 945 F.Supp. 675, 685–90 (S.D.N.Y.1996); *Gardiner Stone Hunter Int'l v. Iberia Lineas Aereas de Espana, S.A.,* 896 F.Supp. 125, 130 (S.D.N.Y.1995).

**12.** *See generally Gates,* 54 F.3d at 1462–63.

**13.** *Id.* at 1462.

ment outlined above is not the inevitable result of a literal reading of the statute.

Next, the first clause of Section 1603(b)(2) makes a political subdivision of a foreign state an "agency or instrumentality" of that state. By the same reasoning that would treat a first-tier subsidiary as an "agency or instrumentality" of the state as a "foreign state," this clause would equate a "political subdivision" of the state as a "foreign state." But if a political subdivision were the statutory equivalent of a "foreign state," the phrase "or political subdivision" in Section 1603(b) would be superfluous. In consequence, the use of "political subdivision" in Section 1603(b) suggests that a second-tier subsidiary is not a "foreign state."

Finally, if Congress intended that an "agency or instrumentality" of a foreign state within the meaning of Section 1603(b) be indistinguishable from a "foreign state" for purposes of Section 1603(a), it is difficult to see why Section 1603(b)(2) does not refer to an "agency or instrumentality" as one whose ownership of the majority of the shares of another company would render that company itself an "agency or instrumentality" of a foreign state.[14] In other words, if Congress had intended a second-tier subsidiary to be a "foreign state" within the meaning of Section 1603(a), a much clearer way to express that thought would have been for the second clause of Section 1603(b)(2) to read "or a majority of whose shares or other ownership interest is owned by a foreign state or *an agency or instrumentality* or political subdivision thereof ..." The omission of the italicized words or their substantial equivalent thus

leaves the literalist approach to the statute somewhat less than conclusive.

 Where, as here, the statutory language leaves considerable doubt as to Congress' intention, it is appropriate to look to the legislative history and to construe the language in its light. And that history provides considerable help in resolving this case.

> "[T]he jurisdiction imparted by the FSIA is premised upon specific considerations of international comity and non-interference with the executive branch's foreign policy authority.
>
>> '[E]nactment of the FSIA was in response to unique policy considerations touching on the international relations of the United States .... Indeed, the Supreme Court has acknowledged Congress' deliberate intent to circumvent much of the potential for interference with the federal government's foreign relations caused by lack of uniformity and local bias in civil caselaw [*sic*] involving foreign states as defendants by channeling private actions against foreign sovereigns away from the state forums and into federal courts to be adjudicated in nonjury trials.' "[15]

In other words, one of the principal reasons for the broad grant of federal subject matter jurisdiction in the FSIA was to ensure, so far as possible, that a federal forum would be available where the interests of a foreign nation are involved in a manner which might affect the ability of the executive branch to conduct successful foreign policy. A niggardly construction

---

14. *Id.* at 1462–63.

15. *Jugobank A.D. Belgrade v. Sidex Int'l Furniture Corp.*, 2 F.Supp.2d 407, 412 (S.D.N.Y. 1998) (quoting *In re Texas Eastern Trans. PCB Contamination Lit.*, 15 F.3d 1230, 1239 (3d Cir.1994) (citing *Ruggiero v. Compania Perua-*

*na de Vapores*, 639 F.2d 872 (2d Cir.1981); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); H.R. REP. NO. 94–1487, 94th Cong., 2d Sess. 13 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6611–12)).

of the provisions defining "foreign state" could render the Act inapplicable even where foreign government interest in the entity before the Court could have substantial foreign policy implications.

Against this background, the question before the Court comes into sharper focus. Where, as here, a foreign government owns eighty percent of the beneficial interest in an entity, particularly its national air carrier, there can be little doubt that the interests of the foreign sovereign are implicated to an extent sufficient to bring the case within the intended ambit of the statutory language.

Plaintiff resists this conclusion, contending that this construction of the FSIA would lead, in the Seventh Circuit's words, to "infinite looping"[16]—treating a corporation far removed from any foreign government as a "foreign state" because a majority of its shares is held by a company, a majority of whose shares is owned by another company, and so on *ad infinitum* until the top company is majority-owned by a foreign state—and therefore to absurd results.[17] The argument, to be sure, has its appeal. At the simplest level, if Nation A owned 51 percent of Company B and Company B owned 51 percent of Company C, the beneficial interest of Nation A in Company C would be approximately 25 percent. Far more egregious examples could be constructed. And even in this simple example, the case for treating Company C—three-quarters of which would be in private ownership—as a "foreign state" would be considerably weaker than for so treating SAA. But "infinite looping" is not an inevitable consequence of construing Section 1603(b)(2) so as to make SAA, by virtue of Transnet's ownership of eighty percent of its shares, an "agency or instrumentality" of the Republic of South Africa. One might well read the statute, for example, as bringing second-and lower-tier subsidiaries of a foreign nation within the definition of "foreign state" provided that the foreign government *beneficially* owns a majority of the shares of the entity in question. This would bring within the statute, for example, an n*th*-tier subsidiary, all of the shares of which were held by a company at the bottom of a long chain of foreign government subsidiaries, all of the shares of each of which was held by the company above it, all the way up the chain to the foreign government itself, but exclude from its protection Company C in the example earlier in this paragraph. Both of these results would be entirely consistent with the overall policy of the Act. Both would have the added virtue of giving effect to the substance of a foreign government's interest rather than to the form of ownership. But there is no need to formulate any such rule today. Suffice it to say now that where, as here, the Republic of South Africa owns an eighty percent beneficial interest in SAA, the fact that it does so indirectly, through its wholly owned subsidiary Transnet, rather than directly, is immaterial to the analysis. This Court holds that SAA is an "agency or instrumentality" of South Africa and therefore a "foreign state" for purposes of the FSIA.

*Conclusion*

For the foregoing reasons, the plaintiff's motion to remand the case to New York State Supreme Court, Bronx County is denied.

SO ORDERED.

---

**16.** *In re Air Crash Disaster Near Roselawn, Indiana, on October 31, 1994,* 96 F.3d at 940.

**17.** The Ninth Circuit relied on this argument in *Gates.* 54 F.3d at 1462.