**Laura Howell LINTON, et al., Plaintiffs,**

v.

**AIRBUS INDUSTRIE, et al., Defendants.**

**Mr. & Mrs. Stan MOSS, et al., Plaintiffs,**

v.

**AIRBUS INDUSTRIE, et al., Defendants.**

Civ. A. Nos. G–92–102, G–92–103.

United States District Court,
S.D. Texas,
Galveston Division.

July 22, 1992.

Ernest H. Cannon, Ernest Cannon & Associates, Francis I. Spagnoletti, David A. Bickham, Spagnoletti & Associates, Houston, Tex., for plaintiffs.

Raybourne Thompson, Jr., Thad T. Dameris, Mary Lou Strange, Stephen S. Williams, Vinson & Elkins, Houston, Tex., Jacque E. Soiret, Kirtland & Packard, Los Angeles, Cal., George T. Shipley, Baker & Botts, Houston, Tex., A. Douglas Melamed, Stephen Chin, Wilmer, Cutleer & Pickering, Washington, D.C., William L. Maynard, Vincent J. Dugan, Gregory R. Travis, Beirne, Maynard & Parsons, Houston, Tex., Gerald L. Bracht, Mayor Day Caldwell & Keeton, Houston, Tex., for defendants.

## ORDER

KENT, District Judge.

■ This action arises out of an aircrash that occurred on or about February 14, 1990, in Bangalore, India. Plaintiffs initiated this action in Texas state court. Defendants subsequently removed to this Court, and, thereafter, Plaintiffs moved to remand.

Defendants Airbus Industrie ("AI"), Aeroformation ("AeF"), Airbus Industrie of North America, Inc., and Airbus Service

Company, Inc.,[1] argue that removal was proper under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, because AI and AeF are "foreign states" within the meaning of FSIA. For the reasons stated below, the Court does not agree.

## I.

28 U.S.C. § 1441(d) provides that

Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending....

Thus, this action was properly removed if AI or AeF or both is a foreign state within the meaning of FSIA.

The Airbus Defendants argue that AI and AeF are foreign states for purposes of FSIA because each is an "agency or instrumentality of a foreign state" as defined by 28 U.S.C. § 1603. Section 1603 provides, in part,

 (a) A "foreign state" ... includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state....

 (b) An "agency or instrumentality of a foreign state" means any entity—

 (1) which is a separate legal person, corporate or otherwise, and

 (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

 (3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.

## II.

This Order considers only whether the second requirement of section 1603(b) is satisfied. The Airbus Defendants contend that "a majority of the shares or other ownership interest" of both AI and AeF are owned by "a foreign state or a political subdivision thereof." However, it is undisputed that no single foreign state has more than a 50% ownership interest in AI. The Airbus Defendants argue, however, that where an entity is owned by several entities which are themselves at least partially owned by foreign states, the various foreign government ownership interests may be pooled together for purposes of determining whether a majority of the shares or other ownership interest is owned by a foreign state.

Defendants correctly point out that every court that has considered the issue has approved this type of pooling.[2] For example, in *LeDonne v. Gulf Air, Inc.*, 700 F.Supp. 1400 (E.D.Va.1988) the court held that FSIA applied to a suit against a foreign airline that was owned by four Persian Gulf states, notwithstanding that no single state owned more than 50% of the airline. Similarly, in *Rios v. Marshall*, 530 F.Supp. 351 (S.D.N.Y.1981), the court held that British West Indies Central Labour Organization, an unincorporated association serving as the administrative arm of the Caribbean Regional Labour Board, was an instrumentality of its members for purposes of section 1603(b)(2). Also, in *International Ass'n of Machinists v. Organization of Petroleum Exporting Countries*, 477 F.Supp. 553 (C.D.Cal 1979) (*"OPEC"*), the court apparently assumed, without explicitly holding, that OPEC is covered by FSIA.

The instant case, however, differs from these cases in one important respect. In *LeDonne*, *Rios*, and *OPEC* each owner which was allowed to pool its interest for purposes of satisfying section 1603(b)(2)'s 50% requirement was itself a foreign state as defined by FSIA. Had an individual owner been sued or had any of the individual owners owned more than 50% of the

---

**1.** Hereinafter referred to collectively as the "Airbus Defendants."

**2.** Neither the Fifth Circuit nor the Supreme Court has considered the issue.

entity that was sued, FSIA would have unquestionably applied.

Not so in the instant case. AI is owned by four corporations. Two of these corporations, which, according to Defendants' calculations,[3] own 42.1% of AI, are controlled by foreign states. Another owner, which controls 20% of AI, is privately owned. The remaining 37.9% is owned by Deutsche Airbus GmbH ("DA"). Thus, assuming that pooling is allowed, the critical question is whether this interest can be pooled with the 42.1% owned by foreign states. If so then FSIA applies; otherwise it does not.

DA is owned by two companies. 20% is owned by Kreditanstalt fur Wiederaufbau ("KfW"), an agency of the German government. The remaining 80% is owned by Messerschmitt–Bolkow–Blohm ("MBB"), a German corporation. Only 36.56% of MBB's shares are owned by foreign states. The other 63.44% privately owned. Thus, only 49.25% of DA's shares are owned by foreign states.

The Airbus Defendants argue that this is irrelevant. To determine whether more than 50% of the shares or other ownership interest of an entity is owned by a foreign state or states, the Court need only consider the total amount owned by foreign states, and need not consider whether the entities contributing ownership interests to be pooled together are themselves foreign states. In the Airbus Defendants' view, since 60.04% of AI's shares are owned by foreign states, it is a foreign state, even though more than 10.04% this ownership interest is asserted through companies a majority of whose shares are held by private owners. Similarly, since 90% of AeF is owned by AI, AeF is also a foreign state.

In the Court's view, the Airbus Defendants' position is difficult to reconcile with either the plain language or the structure and purpose of FSIA. First, it is far from

clear that pooling is allowed under FSIA. To approve pooling, the Court must assume that FSIA applies to entities 50% or more of whose shares are owned by foreign states, even though no single foreign state owns more than 50%. Section 1603, however, speaks only of entities 50% or more of whose shares are owned by a foreign state, singular. Arguably, had Congress wished to permit pooling, it could have easily defined a foreign state as an entity 50% or more of whose shares are owned by a foreign state or states. Because Congress did not so define foreign state, it is not for the courts to substitute this definition for the one provided.

Moreover, even assuming that pooling is permitted, it is one thing to say that where an entity is owned by several other entities, FSIA applies to the first entity if more than 50% of its shares are owned by entities which are themselves foreign states. It is quite another thing to say that entities which are not foreign states or their instrumentalities may nevertheless pool their ownership interests in another entity such that FSIA applies to the latter.

Obviously FSIA applies to foreign states. Likewise, under section 1603, an entity 50% or more of whose shares are owned by a foreign state is itself a foreign state. In the Court's view, although reasonable minds could disagree, it does not do too much violence to either the plain language or the spirit of FSIA to hold that foreign states may pool their interests in an entity for purposes of determining whether that entity is a foreign state under FSIA. FSIA would unquestionably apply if any owner were a party or if more than 50% of the entity in question were owned by any single foreign state. It is not, therefore, too much of a stretch to assume that Congress intended FSIA to apply to an entity owned by several foreign states, even if no single foreign states owns a majority: a majority

---

**3.** Plaintiffs dispute the accuracy and admissibility of several of the Airbus Defendants' calculations. Because the Court has determined that FSIA does not apply even if these calculations are correct, the Court accepts the Airbus Defen-dants' calculations for purposes of this Order only. The Court does not reach any of Plaintiffs' objections, however, and the use of the Airbus Defendants' calculations for purposes of this Order does not imply any final acceptance.

of the entity's stock or other ownership interest is still owned by foreign states to which Congress clearly intended FSIA to apply.

Just as clearly, however, FSIA does not apply to entities that are not foreign states, nor does it apply to entities owned by entities which are not foreign states. In the Airbus Defendants' view, however, FSIA may apply to an entity, even if a majority of the shares of that entity are owned by an entity which is not a foreign state. For example, if 48% of the shares of "Entity A" are owned by a foreign state, and "Entity B" is wholly owned by "Entity A," FSIA does not apply to either. Under the Airbus Defendant's approach, however, if "Entity A" sells 5% of the shares of "Entity B" to another entity which is entirely owned by a foreign state, FSIA will apply to "Entity B," *even though 95% of the shares of "Entity B" are owned by an entity which is not a foreign state and which is explicitly excluded from the protections of FSIA.* That more than 50% of the total ownership of "Entity B" is controlled by one foreign state or another does not negate the fact less than 5% of Entity B's shares are actually owned by a foreign state.

The notion that FSIA applies under these circumstances is inconsistent with the statute's text and purpose. By defining "foreign state" as an entity 50% or more of whose shares are owned by a foreign state, Congress clearly indicated its intention that FSIA apply only to those entities wherein a majority interest is owned by a foreign state. To accept the Airbus Defendants' arguments would severely eviscerate the 50% requirement. Quite simply, and in direct contradiction to the statute's plain language, FSIA would apply to numerous entities even though less than 50% of their shares were owned by a "foreign state" *as Congress has chosen to define that term.* The Court finds nothing to indicate that Congress intended that FSIA be so applied.[4] No court has ever approved an such application,[5] and the Court, in the absence of any Congressional directive whatsoever, declines to craft a new rule that would substantially broaden the reach of FSIA.

Therefore, the Court holds that the Airbus Defendants have not met their burden of proof: FSIA does not apply to Airbus Industrie and Aeroformation because Deutsche Airbus GmbH is not a foreign

**4.** The enactment of FSIA did not create a new federal cause of action or change the substantive law concerning the liability of foreign states. *First Nat'l City Bank v. Banco Para El Comercio Exterior,* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). Rather, in enacting FSIA, Congress intended only to codify the restrictive theory of sovereign immunity. *See, e.g., LeDonne v. Gulf Air, Inc., supra,* 700 F.Supp. at 1405. The Court has found no pre-FSIA cases approving the type of pooling suggested by the Airbus Defendants, or, indeed, any type of pooling.

**5.** The Airbus Defendants argue that the unreported decision in *Aluminum Distrib., Inc. v. Gulf Aluminum Rolling Mill Co.,* No. 87–C–6477, 1989 WL 64174 (N.D.Ill. June 8, 1989) (*"GARMCO"*) supports their position. It does not. In *GARMCO* the ownership of the defendant's stock was as follows: Bahrain owned 25.47%; Iraq owned 11.32%; Oman owned 5.66%; Qatar owned 5.55%; Gulf Investment Corporation, a Kuwait shareholding company owned by Bahrain, Saudi Arabia, Oman, Qatar, Kuwait and the United Arab Emirates, owed 14.5%; and Saudi Basic Industries Corp., 70% of whose ownership was held by Saudi Arabia, owned 20.75%. In addition, 16.98% was owned by the

Industrial Bank of Kuwait, which was 31.4% owned by Kuwait.

The Airbus Defendants assert that, given this last fact, *GARMCO* can be read as support for the proposition that entity's which are partially owned by foreign states but are not themselves foreign states may nevertheless pool their ownership interest in a third entity for purposes of determining whether that third entity is a foreign state for FSIA purposes. Nowhere in its opinion, however, does the *GARMCO* court reach such a conclusion. Instead, the court merely stated in its recitation of facts, the fact that the 16.98% of the defendant's shares were held by the Industrial Bank of Kuwait. The court then rejected the plaintiff's contention that to be a foreign state, more than 50% of an entity's shares must be held by a single foreign state and held that the defendant was a foreign state. In *GARMCO,* in contrast to the instant case, more than 50% of the defendant's shares were owned by entities *which were themselves foreign states.* Thus the court did not need to consider whether the Industrial Bank of Kuwait could pool its ownership interests with the others, and consequently, the court did not address this issue.

state for purposes of FSIA.[6]

IT IS SO ORDERED.

---

**6.** Similarly, in the Court's view, MBB, which owns 80% of DA, should not be allowed to pool its interest because it is also not a foreign state.