Laura Howell LINTON, et al., Appellants,

v.

AIRBUS INDUSTRIE and Aeroformation, Appellees.

No. 14–95–00371–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 12, 1996.

Rehearing Overruled Dec. 5, 1996.

Lewis E. Henderson, Francis I. Spagnoletti, Michael J. Maloney, David W. Holman, Kevin Dubose, Houston, for appellants.

Thad T. Dameris, Houston, John R. Gilbert, Angleton, Charles Schwartz, Raybourne Thompson, Jr., Michael J. Mucchetti, Houston, Jacques E. Soiret, Los Angeles, CA, for appellees.

Before YATES, JOE L. DRAUGHN* and O'NEILL, JJ.

## OPINION

O'NEILL, Justice.

This is an appeal from an order granting appellees' motion for special appearance and dismissing appellants' claims for lack of subject matter jurisdiction. The trial court found appellees to be immune from suit in the United States because they are foreign sovereigns under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602–11 (1989). We reverse and remand.

### I. Background

This case arises from a suit brought by surviving family members of passengers killed in a crash of an Indian Airlines flight in Bangalore, India, in February of 1990. Two lawsuits were originally filed in state district court in Brazoria County, Texas, one by Laura Howell Linton, et al., and the other by Mr. and Mrs. Stan Moss, et al. Appellants alleged various products liability and negligence theories of recovery against Airbus Industrie ("AI"), who designed, tested and assembled the aircraft, and Aeroformation ("AeF"), who trained the pilots (AI and AeF are hereinafter referred to collectively as "the Airbus defendants" or "appellees").

On March 13, 1992, the cases were removed to the United States District Court for the Southern District of Texas, Galveston Division, on the basis of diversity and foreign

---

* The Honorable Joe L. Draughn sitting by assignment.

sovereign immunity. The court *sua sponte* consolidated the actions, and Linton and Moss filed a motion to remand their cases to state court. On April 13, 1992, the Airbus defendants filed motions to dismiss the cases arguing that, as an "agency or instrumentality of a foreign state" under the FSIA, they are entitled to absolute immunity from suit in the United States. On July 22, 1992, the federal district court held that the FSIA did not apply because the Airbus defendants are not agencies or instrumentalities of a foreign state. *Linton v. Airbus Industrie*, 794 F.Supp. 650, 653–54 (S.D.Tex.1992) (hereinafter *"Linton I"*). The Airbus defendants appealed the court's decision, but the appeal was dismissed on the ground that the court's order was not a final, appealable order.

Finding it lacked subject matter jurisdiction, the federal district court remanded the case to state court, but stayed the remand order to allow the Airbus defendants to appeal the *Linton I* decision. The Airbus defendants appealed the remand order, but the Fifth Circuit found it had no appellate jurisdiction over a remand order and dismissed the appeal. *See Linton v. Airbus Industrie*, 30 F.3d 592, 600 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 639, 130 L.Ed.2d 545 (1994)(hereinafter *"Linton II"*). The federal district court, in turn, remanded the case to the state district court in Brazoria County.

The Airbus defendants again filed a motion for special appearance arguing their immunity as agencies or instrumentalities of a foreign state under the FSIA. After a hearing on the motion, the trial court found appellees to be foreign sovereigns under § 1603(b)(2) of the FSIA and dismissed the case for want of jurisdiction.

## II. Standard of Review

■ Appellants contend the Airbus defendants should have challenged the court's subject matter jurisdiction by filing a Rule 85 plea to the jurisdiction rather than a Rule 120a special appearance. TEX.R.CIV.P. 85, 120a. As a result, appellants argue, we must accept all of the allegations in appellants' petition as true and should review the trial court's findings of fact "without giving them

the deference ordinarily anticipated in the resolution of fact issues." We disagree.

Challenges to the immunity of a foreign sovereign are commonly brought under TEX. R.CIV.P. 120a and have been upheld. *See, e.g., K.D.F. v. Rex*, 878 S.W.2d 589 (Tex. 1994); *United Mexican States v. Ashley*, 556 S.W.2d 784 (Tex.1977). Moreover, appellants challenge only the legal assumptions underlying the trial court's fact findings, not their accuracy. Finally, even if the challenge should have been brought as a Rule 85 plea to the jurisdiction, appellants have failed to present any argument as to why such error would be reversible. We reject appellants' argument that the Airbus defendants' special appearance was an improper procedure to challenge the trial court's jurisdiction.

■ An appellate court must review all of the evidence before the trial court on the question of jurisdiction raised in a special appearance. *Vosko v. Chase Manhattan Bank, N.A.*, 909 S.W.2d 95, 99 (Tex.App.— Houston [14th Dist.] 1995, writ denied); *Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 632 (Tex.App.—Dallas 1993, writ denied). In the present case, the trial court made findings of fact and conclusions of law, which are binding upon the appellate court unless challenged on appeal. *Hotel Partners*, 847 S.W.2d at 632 (citing *Wade v. Anderson*, 602 S.W.2d 347, 349 (Tex.Civ. App.—Beaumont 1980, writ ref'd n.r.e.) and *Zelios v. City of Dallas*, 568 S.W.2d 173, 175 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.)). Appellants do not contest the accuracy of the trial court's findings of fact; rather, appellants challenge the legal assumptions underlying those findings. We may review the conclusions the trial court draws from or applies to the facts found to determine their correctness. *Hotel Partners*, 847 S.W.2d at 632 (citing *Mercer v. Bludworth*, 715 S.W.2d 693, 697 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.)).

## III. Points of Error One and Two

In their first point of error, appellants contend the trial court erred in dismissing their case for lack of subject matter jurisdiction because appellees are not agents or in-

strumentalities of a foreign state as defined in § 1603(a) of the FSIA.

The FSIA is the exclusive basis of jurisdiction in federal and state courts for suits involving foreign sovereigns. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 433, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989). The Act provides that, subject to certain exceptions enumerated in the Act,[1] "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604. A "foreign state" is defined in the Act to include an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality of a foreign state" is defined as follows:

(b) An "agency or instrumentality of a foreign state" means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or *a majority of whose shares or other ownership interest is owned by a foreign state* or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b) (emphasis added). This appeal concerns interpretation of the second requirement of § 1603(b), specifically, whether or not a majority of appellees' shares or other ownership interest is owned by a foreign state.

Airbus Industrie (AI) and Aeroformation (AeF) are separate French legal entities known as Groupement d'Interet Economique, and are organized pursuant to treaties between the governments of France, Germany and Spain. Because AI owns 90% of AeF, we will first examine AI's ownership structure.

AI is owned by four corporations, none of which holds a majority interest. Two of

these corporations, Aerospatiale (owned 99% by the French Republic) and CASA (owned 83% by the Spanish State) are controlled by foreign states and together own 41.9% of AI. British Aerospace is privately held and owns 20% of AI. The remaining 37.9% of AI is owned by Deutsche Airbus GmbH ("DA") and is the focus of the present dispute. DA is 50.75% privately owned. The remaining 49.25% ownership is divided between the Republic of Germany (20%), the State of Bavaria (13.46%), the City of Hamburg (10.19%), and the City of Bremen (5.59%).

Because 50.75% of DA's shares are privately owned, appellants argue that it cannot be considered an agency or instrumentality of a foreign state. Therefore, appellants contend, DA's 49.25% sovereign ownership may not be "tiered" through the company and "pooled" with the sovereign ownership interests of France and Spain to qualify for FSIA immunity. Appellees, on the other hand, argue that the relevant inquiry is the total amount of shares ultimately owned by foreign states, not whether the entities contributing ownership interests to be pooled together are themselves foreign states. The Fifth Circuit succinctly defined the issue before us as follows: "whether through 'tiering' a foreign state's ownership interest can be attributed when that foreign state did not own a majority interest in the company that held the ownership interest in Airbus." *Linton II* at 597 n. 28.

### A. Pooling

Appellants claim the plain language of the FSIA indicates that "foreign state" status is conferred only where a majority interest in the entity in question is owned by a single foreign state, not a number of foreign states. In other words, pooling should not be allowed when *no single foreign state owns more than 50% of the entity*. Appellants' argument finds some support in the federal district court's opinion in *Linton I*. The federal court focused on the literal wording of the statute, which "speaks only of entities 50% or more of whose shares are owned by a foreign state, singular." *Id.* at 652. Had Congress intended to permit pooling, the court rea-

---

1. The trial court found that none of the exceptions contained in the Act apply. Appellants have not challenged this finding on appeal.

soned, "it could have easily defined a foreign state as an entity 50% or more of whose shares are owned by a foreign state or states." *Id.*

In *Linton II*, the Fifth Circuit noted that the district court's reasoning should be examined in light of the rules of statutory construction. *Linton II*, 30 F.3d at 598 n. 28. The court cited 1 U.S.C. § 1, which provides that "words importing the singular include and apply to several persons, parties, or things" unless the context indicates otherwise. *Id.* The Fifth Circuit also cited several authorities that had approved of pooling in such a situation. *Id.* (citing *LeDonne v. Gulf Air, Inc.*, 700 F.Supp. 1400, 1405–06 (E.D.Va. 1988); *International Ass'n of Machinists & Aerospace Workers v. OPEC*, 477 F.Supp. 553, 568–69 (C.D.Cal.1979), *aff'd on other grounds*, 649 F.2d 1354 (9th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982); *Rios v. Marshall*, 530 F.Supp. 351, 371 (S.D.N.Y.1981)). More recently, in *In Re Aircrash Disaster Near Roselawn, Indiana*, 909 F.Supp. 1083, 1093 (N.D.Ill.1995) (hereinafter "*Roselawn*"), the court specifically found that 1 U.S.C. § 1 "permits reading § 1603(b)(2) as referring to majority ownership by 'foreign states' rather than simply 'a foreign state.'"

Despite its general skepticism regarding the concept of pooling, the federal district court in *Linton I* recognized that "every court that has considered the issue has approved this type of pooling." *Linton I* at 651. Acknowledging these authorities, the court stated:

FSIA would unquestionably apply if any owner were a party or if more than 50% of the entity in question were owned by any single foreign state. It is not, therefore, too much of a stretch to assume that Congress intended FSIA to apply to an entity owned by several foreign states, even if no single foreign states [sic] owns a majority; a majority of the entity's stock or other

ownership interest is still owned by foreign states to which Congress clearly intended FSIA to apply.

*Id.* at 652–53.

Like appellants in the present case, the plaintiffs in *LeDonne v. Gulf Air, Inc.*, 700 F.Supp. 1400 (E.D.Va.1988) argued that the FSIA does not apply unless a majority ownership vests in a single foreign state. Rejecting the plaintiffs' position, the federal district court stated:

This is an unnecessary literalism that runs counter to the Act's purpose and ignores the well-established international practice of states acting jointly through treaty-created entities for public or sovereign purposes. If the policies that animate the FSIA are to be given their full range, it must, therefore, apply to treaty-created instrumentalities jointly owned by foreign states.

*Id.* at 1406. Similarly, in *Roselawn*, the district court held "[t]here is simply no sound policy justification for reading the FSIA to apply to an entity majority owned by one foreign state but not to apply to an entity majority owned by two or more foreign states." *Roselawn*, 909 F.Supp. at 1093.

▮ We see no reason to deviate from this well-reasoned principle. A majority of courts examining the issue have held that foreign states may pool their interests for purposes of meeting the § 1603(b)(2) majority ownership requirement. *See, e.g., Mangattu v. M/V IBN HAYYAN*, 35 F.3d 205, 207–08 (5th Cir.1994) (holding foreign states can pool their ownership interests for purposes of meeting § 1603(b)(2)); *LeDonne*, 700 F.Supp. at 1406 (holding pooling allowed where corporation owned equally by four nations);[2] *see also Kern v. Jeppesen Sanderson, Inc.*, 867 F.Supp. 525, 530–31 (S.D.Tex. 1994); *Aluminum Distributors, Inc. v. Gulf Aluminum Rolling Mill Co.*, 1989 WL 64174 (N.D.Ill.1989). We therefore find that the pooling of ownership interests between foreign sovereigns where no single state owns more than 50% is acceptable under the FSIA.

2. Those cases, like the instant case, all involve entities which were created by treaty or were a multi-national joint venture. "In such circumstances, there are sufficient indicia that sovereign states are jointly acting in their sovereign capacities through the entity and that the entity should therefore qualify as a sovereign state." *Gardiner Stone Hunter v. Iberia Lineas Aereas*, 896 F.Supp. 125 (S.D.N.Y.1995).

## B. Tiering

### 1. Tiering through majority-owned intermediaries.

Appellants argue that, even if pooling is allowed under the FSIA, AI is not a foreign sovereign because "no foreign nation directly owns any portion of [AI]." Appellants' argument is based on the fact that France, Spain and Germany do not hold direct ownership interests in AI; rather, their ownership is held through various intermediate corporate entities. The issue is whether France, Spain and Germany may "tier" their ownership interests through the corporate intermediaries Aerospatiale (owned 99% by the French government), CASA (owned 83% by the Spanish government), and Deutsche Airbus GmbH (DA) (owned 49.25% by the Republic of Germany, the State of Bavaria, and the cities of Hamburg and Bremen).

Appellants argue that if the majority of a corporate entity's stock is owned by "an agency *or instrumentality of a foreign state*," it is not owned by a "foreign state or political subdivision thereof" as defined by the FSIA. If Congress had intended otherwise, appellants reason, the statute would have defined an "agency or instrumentality of a foreign state" as an entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof *or an agency or instrumentality of a foreign state*." This very issue was recently analyzed by two courts with conflicting results. *See Gates v. Victor Fine Foods*, 54 F.3d 1457 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 187, 133 L.Ed.2d 124 (1995) and *Roselawn*, 909 F.Supp. at 1093–1097.

In *Gates*, the Ninth Circuit determined that tiering was not permissible under the FSIA for the same reasons urged by appellants. *Gates*, 54 F.3d at 1462. The court observed: "the statute provides that a foreign state *includes* an agency or instrumentality, not that it *is* an agency or instrumentality or that it is *defined as* an agency or instrumentality." 54 F.3d at 1462 (emphasis in original). The court also determined that a "foreign state" could not be equated with an "agency or instrumentality of a foreign state" because:

> If Congress had intended 'agencies or instrumentalities of a foreign state' to mean 'a foreign state' for the purposes of section 1603, then it also would have intended a 'political subdivision' to mean 'a foreign state' because section 1603(a) defines a foreign state as including both 'a political subdivision of a foreign state or an agency or instrumentality of a foreign state.' The statutory language strongly indicates that Congress did not intend this interpretation, however, because the remainder of the section differentiates between 'foreign states' and 'political subdivisions thereof.'

> For example, section 1603(b)(2) provides that the entity must be 'an organ of a foreign state *or political subdivision thereof,*' or a majority of its shares must be owned by a 'foreign state *or political subdivision thereof.*'

54 F.3d at 1462 (emphasis in original). The court emphasized the House Report's distinction between foreign states and political subdivisions thereof and concluded:

> Congress seemed exceedingly conscious of the distinction between foreign states, political subdivisions, and agencies or instrumentalities of foreign states and political subdivisions. It could easily have stated that an entity must be owned by a foreign state, a political subdivision *or an agency or instrumentality* of a foreign state or political subdivision. It did not.

*Id.* (emphasis in original). The *Gates* court disallowed "tiering" of a foreign state's ownership interest through corporate intermediaries, and held that an entity wholly owned by "an agency or instrumentality of a foreign state" is not owned by "a foreign state or political subdivision thereof." *Id.* at 1462. Appellants also cite *Gardiner Stone Hunter International v. Iberia Lineas Aereas de Espana, S.A., et al.,* 896 F.Supp. 125 (S.D.N.Y. 1995), which followed the *Gates* decision.

Faced with the identical issue, the Northern District of Illinois sharply disagreed with the *Gates* statutory analysis. *Roselawn*, 909 F.Supp. at 1093–1097. The court questioned the *Gates* observation that "the statute provides that a foreign state *includes* an agency or instrumentality, not that it *is* an agency or instrumentality or that it *is defined* as an agency or instrumentality." *Id.* at 1094–95. Finding use of the word "includes" to be "of

very little import," the court observed that § 1603 provides "Definitions" of terms used in the FSIA. *Id.* at 1095. Noting that the legislative history indicates "Subsection (a) *defines* the term foreign state *as used in all provisions* of [the Act] ...," the *Roselawn* court concluded that "[t]he plain meaning of this definitional provision, as informed by its legislative history, is that where the term foreign state occurs in the Act it is to be read as including agencies and instrumentalities of the foreign state." *Id.* (emphasis in original) (citing H.R.Rep. No. 1487, 94th Cong.2d Sess. 15 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 6604, 6613) (hereinafter the "House Report").

Next, *Roselawn* found that the *Gates* distinction between foreign states and political subdivisions "flies in the face of both the plain language of § 1603(a) as well as the House Report's analysis of § 1603(a)."[3] *Roselawn*, 909 F.Supp. at 1095. Considering the legislative intent, the *Roselawn* court stated:

> ... [i]n view of Congress' clear statement that § 1603's definition of foreign state applies 'except as used in section 1608,' we find it inconceivable that Congress intended to nullify that definition in the section immediately following it through the roundabout method of including a reference to political subdivisions and inviting the reader to rely on the canon of statutory construction *expressio unis est exclusio alterius* ('Expression of one thing is the exclusion of another').

> Rather, we conclude that the term foreign state as used in § 1603(b)(2) includes the agencies or instrumentalities of a foreign state. Although it is less than clear, we surmise that Congress included the superfluous reference to a 'political subdivision' in § 1603(b)(2) for emphasis rather than to alter the definition of the term foreign state and that Congress omitted explicit (and equally superfluous) reference to agencies or instrumentalities in § 1603(b)(2) because it would render the definition of 'agency or instrumentality of a foreign state' circular—defining the term by way of referring to the term. Thus, while the *Gates* court was certainly correct that Congress 'could easily have stated that [in order to be deemed an agency or instrumentality of a foreign state] an entity must be owned by a foreign state, a political subdivision *or an agency or instrumentality of a foreign state or political subdivision,*' *Gates*, 54 F.3d at 1462, to do so would have introduced an unnecessary circularity into the statute.

*Id.* at 1096. The *Roselawn* court emphasized that, "until very recently, courts have uniformly considered majority state-owned corporations to be agencies or instrumentalities of foreign states for FSIA purposes even where the state ownership was only indirect." *Id.* at 1093.[4]

---

**3.** In the House Report's analysis of § 1603(a), the House Judiciary Committee observed:

> Subsection (a) defines the term foreign state as used in all provisions of chapter 97 [the "Jurisdictional Immunities of Foreign States" chapter of the United States Code], except section 1608. In section 1608, the term 'foreign state' refers only to the sovereign state itself.

H.R.REP. NO. 1487, 94th Cong., 2d Sess. 15 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6613.

**4.** The *Roselawn* court relied on the following authorities: *Delgado v. Shell Oil Co.*, 890 F.Supp. 1315, 1318 n. 5 (S.D.Tex.1995) (finding Dead Sea Bromine Co., Ltd. to be an agency or instrumentality of Israel even though Israel owned a majority of its shares indirectly: "[t]he fact that Israel's ownership interest in Dead Sea is 'indirect' because Dead Sea is a wholly owned subsidiary of an entity in which Israel owns an indirect majority interest is immaterial."); *Talbot v. Saipem A.G.*, 835 F.Supp. 352, 353 n. 2 (S.D.Tex. 1993) (finding defendant Saipem S.p.A. to be a foreign state where it was owned indirectly (third-tier) by Italy's Ministry of Treasury through a chain of intermediary corporations and noting "[t]hat Saipem's ownership by the Italian government is indirect is immaterial"); *Trump Taj Mahal Assocs. v. Costruzioni Aeronautiche Giovanni Agusta S.p.A.*, 761 F.Supp. 1143, 1150 (D.N.J.1991) (finding defendant Augusta S.p.A. to be a foreign state under § 1603(b)(2) despite the fact that its link to the Italian government was "triple-tiered"), *aff'd without opinion*, 958 F.2d 365 (3d Cir.), *cert. denied*, 506 U.S. 826, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992); *Rutkowski v. Occidental Chem. Corp.*, 1988 WL 107342 (N.D.Ill.1988) (finding defendant Asbestos Corp. Ltd. ("ACL") to be a foreign state under § 1603(b)(2) despite the fact that Quebec's ownership of ACL was tiered through two other corporations); *cf. Credit Lyonnais v. Getty Square Assocs.*, 876 F.Supp. 517 (S.D.N.Y.1995) (applying § 1603(b)(2) in the context of 28 U.S.C. § 1332(a)(4) and permitting the pooling of direct French ownership interests in defendant deriving through an intermediary corporation).

The *Roselawn* court concluded that an entity directly majority-owned by a foreign state is an agency or instrumentality of a foreign state and, under § 1603(a), is also a foreign state:

> This Court's reading of § 1603(b)(2) in conjunction with § 1603(a) leads to the conclusion that *so long as the corporate intermediaries standing between a foreign state and a defendant seeking to invoke foreign state status are themselves majority owned by a statutorily-defined 'foreign state'* (which, to be explicit, includes an agency or instrumentality of a foreign state), such tiering of ownership interests will not deprive the defendant of foreign state status.

*Roselawn*, 909 F.Supp. at 1094 (emphasis added). The *Roselawn* court also rejected an argument similar to that made by appellants in this case when it held that

> ... permitting pooling does nothing to 'remove' or 'distance' the foreign state from the entity. The ownership interests in the entity are no more remote whether the entity is owned by one foreign state or several. It is only tiering that permits the ownership interests of the foreign sovereign to become, in some sense, remote. However, as we have seen, this possibility derives from the language of the Act and we have neither the authority nor the inclination to rework the statute.

*Id.*

■ Although the wording of the FSIA has often been criticized as vague,[5] we find the *Roselawn* court's statutory analysis persuasive. Absent an expression of Congressional intent to the contrary, we can perceive no policy reason why tiering through an intermediary majority owned by a foreign state should not be permitted under the FSIA. We therefore hold that tiering through a majority owned intermediary is permissible to determine whether an entity is entitled to foreign state status under the FSIA.

#### 2. Tiering through non-majority owned intermediaries

While the *Roselawn* court's analysis is instructive, it does not directly address the issue presented in this appeal: whether tiering should be allowed where the corporate intermediary is not majority owned by a foreign state. On this question our only authority is the *Linton* case itself.

In *Linton I*, the federal district court determined that the FSIA does not apply to AI because one of the pooling entities, DA, is not a foreign state. *Linton I*, 794 F.Supp. at 652. In order for the FSIA to apply, the 49.25% German interest has to be counted; however, the German ownership interest is held through DA, which is 50.75% privately owned and therefore not itself an agency or instrumentality of a foreign state. Because DA is not an agency or instrumentality of a foreign state, the court reasoned, Germany's interest may not be tiered through the corporate intermediary and pooled with the interests of France and Spain. *Id.* The federal district court rejected appellees' argument that it need not consider whether the entities contributing ownership interests to be pooled are themselves foreign states:

> The notion that FSIA applies under these circumstances is inconsistent with the statute's text and purpose. By defining 'foreign state' as an entity 50% or more of whose shares are owned by a foreign state, Congress clearly indicated its intention that FSIA apply only to those entities wherein a majority interest is owned by a foreign state. To accept the Airbus Defendants' arguments would severely eviscerate the 50% requirement. Quite simply, and in direct contradiction to the statute's plain language, FSIA would apply to numerous entities even though less than 50% of their shares were owned by a 'foreign

5. *Roselawn*, 909 F.Supp. at 1088 (citing *Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation (C.N.A.N.)*, 730 F.2d 195, 205 (5th Cir.1984)("The FSIA presents a peculiarly twisted exercise in statutory construction."); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 302 (2d Cir.1981)(referring to the FSIA as a "vaguely worded statute"), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *Gibbons v. Udaras na Gaeltachta*, 549 F.Supp. 1094, 1106–05 (S.D.N.Y.1982) (referring to the FSIA as "remarkably obtuse" and "a six-year-old labyrinth that, owing to the numerous interpretive questions engendered by its bizarre structure and its many deliberately vague provisions, has during its brief lifetime been a financial boon for the private bar but a constant bane of the federal judiciary.")).

state' *as Congress has chosen to define that term.* The Court finds nothing to indicate that Congress intended that FSIA be so applied. No court has ever approved such an application, and the Court, in the absence of any Congressional directive whatsoever, declines to craft a new rule that would substantially broaden the reach of FSIA.

*Linton,* 794 F.Supp. at 653 (footnotes omitted) (emphasis in original).

In *Linton II* the Fifth Circuit rejected the Airbus defendants' appeal on procedural grounds, but stated in dicta:

> ... [t]he Airbus Defendants have, at least facially, presented a strong factual and legal claim of immunity.... The controlling statute ... erects no explicit bar to the methods by which a foreign state may own an instrumentality, merely requiring that the *entity claiming immunity*—not its parent—have 'a majority of [its] shares or other ownership interest ... owned by a foreign state or a political subdivision thereof.' 28 U.S.C. § 1603(b)(2). There is no mention of 'voting' or 'control' majority, thus equitable or beneficial majority ownership is not expressly prohibited from serving.

*Linton,* 30 F.3d at 598 n. 28 (emphasis in original). Thus, the Fifth Circuit superficially appeared to disagree with the decision in *Linton I.*

Although in *Linton II* the Fifth Circuit observed, without addressing the issue, that "equitable or beneficial majority ownership" is not expressly *prohibited* from consideration, neither does the FSIA expressly *allow* consideration of such ownership. In fact, the House Report provides no insight whatsoever into the congressional intent behind the majority ownership language contained in § 1603(b)(2).

Appellees urge the application of an ultimate ownership test, arguing that Congress placed in the FSIA no requirement that a foreign government arrange its corporate structures in a particular manner to qualify for immunity. Appellees conclude "the only logical standard is whether the majority of the ownership interest in the entity seeking FSIA protection would ultimately be distributed to foreign states upon dissolution." Ultimate ownership, appellees argue, "presents the only workable standard within the language of the FSIA that would not lead to arbitrary and uneven applications of the FSIA." In support of their argument appellees cite: (1) the general proposition that the FSIA should be broadly construed; (2) the language of the statute itself; (3) case law which they believe favors their position; and (4) an illustration of appellants' anti-tiering position which purportedly leads to an absurd result.

The Airbus defendants argue that FSIA should be broadly construed, citing as authority *Nolan v. Boeing Co.,* 919 F.2d 1058 (5th Cir.1990), *cert. denied,* 499 U.S. 962, 111 S.Ct. 1587, 113 L.Ed.2d 651 (1991). *Nolan,* however, did not address § 1603(b)(2); rather, it discussed the legislative history supporting a broad interpretation of § 1441(d), which allows *removal* of actions by foreign states. *Id.* at 1065. The legislative history supports a broad application of the removal provision as assuring the availability of a federal forum to promote procedural and substantive uniformity in the treatment of foreign sovereigns. *Id.* We have found no concomitant authority for the proposition that a broad interpretation of § 1603(b)(2) in favor of tiering and pooling through non-majority owned intermediaries would promote any underlying purpose of the FSIA.[6]

Appellees next point to the definition of an *agency or instrumentality of a foreign state,* which includes an entity "a majority of whose shares *or other ownership interest* is owned by a foreign state." § 1603(b)(2) (emphasis added). Citing the Fifth Circuit's statement in *Linton II* that "equitable or beneficial majority ownership is not expressly prohibited from serving," appellees claim that their

---

6. In *Delgado v. Shell Oil Co.,* 890 F.Supp. 1315, 1319 (S.D.Tex.1995), the court stated:

   [While the FSIA's] legislative history evinces Congress' intent that the definition of 'agency or instrumentality of a foreign state' be read broadly to encompass 'a variety of forms, ...'

   there is no suggestion that a foreign state's system of property ownership, without more, should be determinative on the question whether an entity operating within the state is a state agency or instrumentality under the [FSIA].

theory of ultimate ownership is supported by the statutory language. However, a review of the legislative history lends no support to this argument. In discussing the majority ownership requirement, the House Report provides:

> Where ownership is divided between a foreign state and private interests, the entity will be deemed to be an agency or instrumentality of a foreign state only if a majority of the ownership interests (*shares of stock or otherwise*) is owned by a foreign state or by a foreign state's political subdivision.

House Report at 6614 (emphasis added). It appears the "other ownership interest" language was meant to apply to other indicia of ownership where the entity in question is something other than a corporation with shares of stock. We find nothing in the legislative history to indicate the statutory language was meant to encompass ultimate ownership of stock held through non-majority owned intermediaries.

Appellees, citing *Wilk v. Creditanstalt Bankverein Int'l*, 1993 WL 97259 (S.D.N.Y. 1993) and *Communications Assocs., Inc. v. Novatel Communications, Inc.*, 1985 WL 2542 (N.D.Ill.1985), urge us to consider the manner in which the foreign sovereign interest in AI and AeF is held in deciding whether to apply the ultimate ownership test. Specifically, AI and AeF were both organized pursuant to treaties between the governments of France, Germany and Spain. Certain responsibilities were controlled by the Intergovernmental Committee, and the French Government agreed to provide whatever administrative services were required. The governments of France and Germany, acting through the Intergovernmental Committee, exercised control and direction of the aircraft development program. However, the status of AI and AeF as agencies or instrumentalities of a foreign state is not determined by a subjective control test. The statute speaks strictly in terms of majority ownership, and we will limit our inquiry to majority ownership as dictated by the statute. *Delgado v. Shell Oil Co.*, 890 F.Supp. at 1318–19.

Appellees provide a hypothetical illustration purporting to show that failure to apply an ultimate ownership test will lead to "arbitrary and uneven applications of the FSIA." Under the hypothetical presented, France owns 49.99% of Corporation A directly. The remaining 50.01% is owned by Entity B, which is owned 49.99% by Germany and 50.01% by a second-tier intermediary, Entity C. Entity C in turn is owned 49.99% by Germany and 50.01% by Entity D. Germany owns 49.99% of Entity D. As a result, France and Germany ultimately own 93.74% of Corporation A. Appellees claim it would be possible to construct an entity 99.98% owned by foreign countries that would not qualify as an agency or instrumentality of a foreign state under appellants' "anti-tiering" reasoning.[7]

Regardless of the merits of the Airbus defendants' hypothetical, we must leave those concerns to the legislative and executive branches of our government, and be directed by Congress' plain language and intent. *See Roselawn*, 909 F.Supp. at 1096.

■ In analyzing the issue presented, the legislative framework of the FSIA is instructive. The FSIA is the exclusive source of subject matter jurisdiction over suits involving foreign states or their instrumentalities. *See, e.g., De Letelier v. Republic of Chile*, 748 F.2d 790, 793 (2d Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985). At the hearings on the bill it was pointed out that American citizens "are increasingly coming into contact with foreign states and entities owned by foreign states," calling into question "whether our citizens

---

7. We find it interesting that the court in *Linton I* constructed what it considered to be an equally dubious scenario applying the Airbus defendants' ultimate ownership test. The court hypothesized that Entity B is wholly owned by Entity A. Entity A is owned 48% by a foreign state. Under this *hypothetical, it is clear the FSIA does not apply* to either Entity A or Entity B. However, under the Airbus defendants' approach, if Entity A sells 5% of the shares of Entity B to Entity C, which is entirely owned by a foreign state, FSIA applies to Entity B even though 95% of the shares of Entity B are privately owned by entities explicitly excluded from the protections of the FSIA. "That more than 50% of the total ownership of Corporation B is controlled by one foreign state or another does not negate the fact less than 5% of Entity B's shares are actually owned by a foreign state." *Linton I*, 794 F.Supp. at 653.

will have access to the courts in order to resolve ordinary legal disputes." HOUSE RE-PORT at 6605. The bill was considered "urgently needed" in a modern world "where foreign state enterprises are every day participants in commercial activities...." *Id.*

The first expressed objective of the FSIA was to codify the so-called "restrictive" principle of sovereign immunity to bring the United States into alignment with international law:

> Under this principle, the immunity of a foreign state is 'restricted' to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis). This principle ... is regularly applied against the United States in suits against the U.S. Government in foreign courts.

*Id.* Although the restrictive principle denies immunity to foreign states in suits based on commercial acts, § 1603(b)(2) in effect creates a *presumption* that any entity majority owned by a foreign state is engaged in sovereign activity.[8] *See Joseph v. Office of Consulate Gen. of Nig.*, 830 F.2d 1018, 1021 (9th Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988); *Meadows v. Dominican Rep.*, 817 F.2d 517, 522 (9th Cir.), *cert. denied,* 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987); *West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 824 (9th Cir.), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2483, 96 L.Ed.2d 375 (1987). This presumption, however, runs contrary to the realities of the modern public commercial sector, which has become so widely diversified as a result of the trend toward privatization of state-owned industries and general economic globalization that "one may safely say that *most* state-owned corporations are engaged in commercial activities." William C. Hoffman, *The Separate Entity Rule in International Perspective: Should State Ownership of Corporate Shares Confer Sovereign Status for Immunity Purposes?*, 65 TUL.L.REV. 535, 566–67 (1991) (hereinafter "Hoffman") (emphasis in original). Moreover, this presumption is directly contrary to the internationally recognized rule which presumes that foreign state owned entities with separate legal personalities generally are not entitled to assert sovereign immunity.[9] *Id.* at 540.

▪ By enacting § 1603(b)(2), Congress opted for a simple majority ownership rule. However, there is no indication in the legislative history that it thereby intended to abandon the restrictive principle and broaden the scope of foreign state immunity. Section 1603(b)(2) defines an agency or instrumentality of a foreign state as an entity "a majority *of whose shares* " is owned by a foreign state. § 1603(b)(2) (emphasis added). AI's shares are directly owned by Aerospatiale, CASA, British Aerospace and DA. Appellees' ultimate ownership test would require us to ignore this level of ownership altogether even though the statute expressly provides otherwise. If DA itself were a party to this action it would not be entitled to FSIA immunity as a foreign state because a majority of its shares are privately held. Moreover, because a majority of DA's shares are privately held, we are unable to conclude that the majority of the ownership interest in AI would "ultimately be distributed to foreign states upon dissolution," which is the focus of the ultimate ownership test urged by appellees. We find it incongruous with the language and purpose of the Act to allow *minority* foreign state ownership in a *privately owned* entity to be tiered and pooled to achieve foreign state status under the FSIA.

The *Roselawn* court's analysis supports this conclusion. Applying that analysis to the present case reveals the following:

---

8. Section 1603(b) has been criticized in this regard for being out of line with international practice: "[n]o country in the world has adopted state ownership as a basis for conferring sovereign legal status on commercial corporations." William C. Hoffman, *The Separate Entity Rule in International Perspective: Should State Ownership of Corporate Shares Confer Sovereign Status for Immunity Purposes?*, 65 TUL.L.REV. 535, 565 (1991).

9. We find it interesting to note that France and Germany, two of the foreign states attempting to pool their ownership interests in the present case, each apply the "separate entity rule" which presumes nonimmunity and, consistent with the restrictive theory, is subject to an exception conferring immunity for sovereign acts. Hoffman, 65 TUL.L.REV. at 561. Thus, it would appear that the United States would not be entitled to foreign state status in those countries under the facts presented in this appeal.

Under § 1603(b)(2), if [DA] is directly majority-owned by a foreign state it constitutes 'an agency or instrumentality of a foreign state,' and therefore, under § 1603(a), it is a 'foreign state.' If [DA], in turn, owns the majority of shares of [AI], [AI] is, by definition, both owned by a foreign state [§ 1603(a)] and is a foreign state [§ 1603(b)(2)].

*Roselawn*, 909 F.Supp. at 1094. The *Roselawn* court concluded that tiering of ownership interests will not deprive the defendant of foreign state status "so long as the corporate intermediaries standing between a foreign state and a defendant seeking to invoke foreign state status are themselves majority owned by a statutorily-defined 'foreign state.'" *Id.*

 Pooling allows the FSIA to apply to an entity "majority owned by two or more foreign states." *See, e.g., Roselawn*, 909 F.Supp. at 1093; *LeDonne*, 700 F.Supp. at 1406. In other words, *foreign states* may pool their ownership interests for purposes of meeting § 1603(b)(2). Tiering recognizes the legislative purpose to disregard the actual corporate form and concentrate on foreign state ownership. In other words, the fact that a state might choose to double or triple tier its ownership does not disturb the entity's "foreign state link." *Trump Taj Mahal*, 761 F.Supp. at 1150. Thus, foreign state majority ownership has consistently been recognized as the necessary link at each level. Ignoring this critical link and applying an ultimate ownership test does not comport with the plain language of the statute, the legislative history or case law.

We hold that foreign state ownership interests in AI derived through DA may not be tiered and pooled with other foreign state ownership interests in AI because DA is not majority owned by a foreign state. As a result, AI is not a foreign state for purposes of the FSIA.

We must now determine whether AeF qualifies for foreign state status under the FSIA. During the relevant time period, AeF was 90% owned by AI and 10% owned by Flight Safety International, Inc., which is not a governmental agency or instrumentality. Disregarding Germany's minority interest in

DA, we have concluded that AI does not qualify for foreign state status because only 42% of its shares are owned by foreign states or their agencies or instrumentalities. For the same reasons we have found that AI is not an agency or instrumentality of a foreign state, we find that AeF does not qualify for foreign state status for purposes of the FSIA. Point of error number one is sustained. Because we hold that appellees are not foreign states for purposes of the FSIA, it is unnecessary to address point of error number two.

The order of the trial court is reversed and this cause is remanded to the trial court for further proceedings in accordance with this opinion.